IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ROBERT BLESS**, | ) | No. 13 C 4271 |
| | ) | |
| Plaintiff**,** | ) | Judge John Z. Lee |
| | ) | |
| v. | ) | |
| | ) | |
| **COOK COUNTY SHERIFF'S OFFICE**, *et al.*, | ) | **JURY DEMAND** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56 STATEMENT AND
STATEMENT OF ADDITIONAL FACTS REQUIRING
DENIAL OF SUMMARY JUDGMENT**

Jeffrey R. Kulwin
Rachel A. Katz
KULWIN, MASCIOPINTO & KULWIN, LLP.
161 North Clark Street, Suite 2500
Chicago, IL 60601
(312) 641-0300

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56 STATEMENT**

**PARTIES**[1]

1. Plaintiff, Robert Bless, is a Caucasian male resident of the Northern District of Illinois and was employed by the Cook County Sheriff's Office from 1996 until 2013. (Exhibit 1, Third Amended Complaint, ¶ 5; Exhibit 2, Plaintiff's Deposition, p. 40:11-12)

**RESPONSE: Undisputed.**

2. Defendants are the Cook County Sheriff's Office ("Sheriff's Office"), Cook County Sheriff Thomas J. Dart, Zelda Whittler, Joseph Ways, Edward Dyner, Dewayne Holbrook, Rosemarie Nolan, Sheryl Collins, Henry Hemphill, and the Cook County Sheriff's Merit Board. (Ex. 1, ¶¶ 7-27)

**RESPONSE: Undisputed.**

3. Cook County Sheriff Thomas J. Dart ("Sheriff Dart") is a Caucasian male and is a Democrat. The Cook County Sheriff's Office has approximately 6,500 current employees and thousands of former employees. (Exhibit 9, Deposition of Rosemarie Nolan, December 9, 2016 ("Day 1"), p. 24:18-23; Exhibit 12, Sheriff Dart's Answers to Interrogatories, ¶ 21).

**RESPONSE: Undisputed.**

4. At all times herein relevant, Zelda Whittler ("Undersheriff Whittler"), an African-American female, served as the Undersheriff of the Sheriff's Office. (Ex. 1, ¶ 15; Exhibit 3, Deposition of Zelda Whittler, p. 9:15-17, 10:9-11; Ex. 12, ¶ 2, 6)

**RESPONSE: Undisputed.**

5. At all times herein relevant, Joseph Ways ("Executive Director Ways"), a Caucasian male and a Republican, served as the Executive Director of the Sheriff's Office's Office of Professional Review ("OPR"). (Ex. 1, ¶ 13; Exhibit 4, Deposition of Joseph Ways, February 2, 2017 ("Day 2"), pp. 4:19-5:1, 307:8-13; Ex. 12, ¶ 2,7) OPR has the responsibility within the Sheriff's Office to investigate potential wrongdoing of Sheriff's Office employees. (Ex. 4, December 1, 2016 ("Day 1"), pp. 16:11-19, 24:14-24; Exhibit 6, Deposition of DeWayne Holbrook, pp. 278:6-279:24).

**RESPONSE: Disputed in part.**

---

[1]. Paragraph citations references to Plaintiff's Response to Defendants' Rule 56.1 Statement and Plaintiff's Statement of Additional Facts and Appendix of Exhibits. The Merit Board filed the Administrative Record and stamped each page with "Ad. Rev." followed by a specific page number. (Dkt. Nos. 26-29.) Plaintiff also cites to the Administrative Record as "AR" followed by the Merit Board's numbering system, e.g., "AR__."

Joseph Ways testified that he privately "identified" as a Republican, but he confirmed there is no registration by political party in Illinois and that he never engaged in political activity in support of any candidates for political office. (Ex. 2 [Ways Dep.], p. 68-69, 333-334.) Joseph Ways further testified that he signed a nominating petition for Democratic state representative candidate Kifowitz. (Ex. 2 [Ways Dep.], p. 335.)

6. At all times herein relevant, Edward Dyner ("Director Dyner"), a Caucasian male and a Republican, served as a Director at OPR. (Ex. 1, ¶ 17; Exhibit 5, Deposition of Edward Dyner, December 7, 2016 ("Day 1"), p. 5:8-9, March 8, 2017 ("Day 2"), p. 74:19-24; Ex. 12, ¶ 2,8)

RESPONSE: Disputed in part.

Edward Dyner testified only that he privately "identified as a Republican" but, apart from signing one petition for a candidate he could not remember, he did not engage in any political activity, e.g., he did not make financial contributions for political reasons, he did not attend rallies or fundraisers, and he did not post signs. (Ex. 23 [Dyner I], p. 55.)

7. At all times herein relevant, Dewayne Holbrook ("Chief Holbrook"), an African-American male, served as the Chief of Police for the Sheriff's Office's Police Department. (Ex. 1, ¶ 11; Ex. 6, pp. 5:23-24, 18:24-19:7; Ex. 12, ¶ 10)

RESPONSE: Undisputed.

8. At all times herein relevant, Sheryl Collins ("Investigator Collins"), an African-American female, served as an investigator for OPR. (Ex. 1, ¶ 19; Exhibit 7, Deposition of Sheryl Collins, pp. 6:11-13, 18:16-23, 19:8-11)

RESPONSE: Undisputed.

9. At all times herein relevant, Henry Hemphill ("Investigator Hemphill"), an African-American male, served as an investigator for OPR. (Ex. 1, ¶ 20; Exhibit 8, Deposition of Henry Hemphill, pp. 4:20-22, 21:15-22)

RESPONSE: Undisputed.

10.   At all times herein relevant, Rosemarie Nolan ("Personnel Director Nolan"), a Caucasian female, served as Personnel Director for the Sheriff's Office. (Ex. 1, ¶ 21; Exhibit 9, Deposition of Rosemarie Nolan, Day 1, p. 4:10-12, 5:14-19; Ex. 12, ¶ 2, 9)

**RESPONSE: Undisputed.**

11.   The Cook County Sheriff's Merit Board (the "Merit Board") is a statutorily authorized administrative body charged with conducting hearings on disciplinary matters involving Sheriff's Office police officers when the Sheriff's Office files written charges requesting suspension in excess of thirty (30) days or separation from service. (Ex. 1, ¶ 24; Exhibit 10, 55 ILCS 5/3-7012, 55 ILCS 5/3-7002) The Merit Board has the exclusive authority to make findings of guilt and to order the separation of Sheriff's Office police officers. (Ex. 10) Upon an order from the Merit Board that an employee should be separated from the Sheriff's Office, Sheriff Dart is statutorily required to direct that the employee be separated from the Sheriff's Office, as ordered by the Board. (Ex. 10; Ex. 12, ¶ 2, 17) By statute, "[n]o more than 3 members of the Board shall be affiliated with the same political party, except that as additional members are appointed by the Sheriff . . . the political affiliation of the Board shall be such that no more than one-half of the members plus one additional member may be affiliated with the same political party." (Ex. 10), Additionally, "[n]o member shall have held or have been a candidate for an elective public office within one year preceding his or her appointment." (Ex. 10) Since January of 2013, not including cases currently pending before the Merit Board and aside from cases resolved by either the employee's resignation, a last chance agreement, a settlement agreement, or where an employee had multiple cases and was terminated as a result of one of the other cases, approximately 30% of the time, the Merit Board has either imposed less discipline than the Sheriff's Office was seeking or determined that the employee should not be disciplined at all. (Exhibit 20, Affidavit of Miriam S. Santiago)

**RESPONSE: Objection.  The last sentence should be stricken and disregarded.  See**

**Pl. Mot. to Strike (R. 295.)**

**Subject to objection, disputed in part.**

**Plaintiff does not dispute that the Merit Board was created per state statute.**

**Plaintiff disputes the contention that the Merit Board is, in fact, an entity that is**

**separate from the CCSO.  Although created by statute (55 ILCS § 5/3-7002), the evidence,**

**viewed in the requisite light most favorable to Plaintiff, shows that the Merit Board is**

**plainly under Sheriff Dart's control.  For example, Merit Board members are appointed**

**by Sheriff Dart and the CCSO has stated previously that the Merit Board is an "agency"**

**of the CCSO; the CCSO "delegates functions" to the Merit Board; and the Merit Board**

"represents the [CCSO's] legal interests.  See Hernandez v CCSO et al., Case: 07 C 855, Dkt. No. 485 at 8-9; Bless v. CCSO, No. 13 C 4271, 2016 WL 958554, at *5 (N.D. Ill. Mar. 8, 2016); Roman v. Cook Cnty. Sheriff's Merit Bd., 2014 IL App (1st) 123308, ¶ 78.

Further, the Illinois Appellate Court recently held that decisions by this Merit Board are void as a matter of law because the Merit Board was constituted illegally.  See Taylor v. Dart, 2016 IL App (1st) 143684 & Taylor v. Dart, 2017 IL App (1st) 143684-B. The Merit Board was deemed to be illegally constituted because John Rosales, a political supporter of Sherriff Dart served on the board in violation of state law.  See also ¶ 143.

### JURISDICTION AND VENUE

12. Plaintiff's Third Amended Complaint invokes jurisdiction over Counts I, III and V pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343 and over Count IV pursuant to this Court's supplemental jurisdiction as codified in 28 U.S.C. §1367(a). (Ex. 1, ¶ 2)

**RESPONSE: Undisputed.**

13. Venue is proper in this Court because all of the events at issue occurred in this judicial district. (Ex. 1, ¶ 3)

**RESPONSE: Undisputed.**

### PLAINTIFF'S EMPLOYMENT AND SECONDARY EMPLOYMENT

14. Plaintiff began working at the Sheriff's Office as a courtroom deputy in 1996. (Ex. 1, ¶ 28; Ex. 2, pp. 40:11-41:6)

**RESPONSE: Undisputed.**

15. In 1997, Plaintiff became a police officer with the Cook County Sheriff's Police Department. (Ex. 2, p. 41:7-9) Specifically, Plaintiff worked as a patrol officer. (Ex. 1, ¶ 29; Ex. 2, p. 35:13-36:6)

**RESPONSE: Undisputed.**

16. As a patrol officer, Plaintiff's general duties and responsibilities included driving a marked squad car, effectuating traffic stops, issuing citations, and answering calls. (Ex. 2, p. 36:10-22)

**RESPONSE: Undisputed.**

17. In addition to being a police officer, Plaintiff also became a licensed attorney in 2004. (Ex. 1, ¶ 31; Ex. 2, p. 44:9-17)

**RESPONSE: Undisputed.**

18. At that time, while employed by the Sheriff's Office, Plaintiff began working secondary employment as an attorney. (Ex. 2, p. 44:9-17) Plaintiff was self-employed as an attorney, establishing the law firm of Bless & Associates, Inc. (Ex. 2, pp. 44:14-45:4) Plaintiff estimates that he worked approximately ten (10) hours per week as an attorney during his career as a lawyer. (Ex. 2, p. 47:4-7)

**RESPONSE: Undisputed.**

19. Beginning in 2008, also while employed by the Sheriff's Office and practicing as an attorney, Plaintiff engaged in additional secondary employment as a McHenry County Commissioner. (Ex. 1, ¶ 32; Ex. 2, p. 49:22-50:3) Plaintiff was elected to the position of McHenry County Commissioner and ran a political campaign as a Republican. (Ex. 2, pp. 50:4-9, 70:4-7) As a McHenry County Commissioner, Plaintiff was paid approximately twenty thousand dollars ($20,000.00) per year. (Ex. 2, p. 89:3-7)

**RESPONSE: Undisputed.**

20. Plaintiff never advised or otherwise conveyed to any of the Defendants that he was running for McHenry County Commissioner, never told any of them about the fundraisers he held, and never discussed his electoral victory with them. (Ex. 2, pp. 81:13-20, 82:3-22; Ex. 12, ¶ 1)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that he testified that he did not advise any of the Defendants specifically about his political campaign.**

**Plaintiff disputes that Defendants were, in fact, unaware of his political activities. The evidence is that Plaintiff had public campaign events, like fundraisers, that were attended by several CCSO employees, including supervisor level employees (and one who was described as the "boss" of Maywood). (Ex. 25 [Bless], p. 49-65; Ex. 3 [Bless Campaign pamphlets & signs].)**

**Plaintiff also disputes that Defendants claim that they were "unaware" of his political activity because, among other reasons, it was provided directly to them by Plaintiff (see ¶ 100, 104) and Defendants (other than Sherriff Dart) have each admitted to reviewing and signing off on Plaintiff's OPR file which contained detailed information about his political activity. (Ex. 19 [Bless OPR File].) Plaintiff's political activity was also otherwise generally known and publicly available information as proven by, among other things, the fact that CCSO employees attended Plaintiff's campaign events and it was covered by the press. (see ¶ 85.)**

21. Plaintiff never advised or otherwise conveyed to any of the Defendants that he was a Republican. (Ex. 2, pp. 122:5-16, 125:5-22, 128:24-129:13; 131:8-14, 133:11-18, 134:5- 15; Ex. 3, pp. 118:23-119:3; Ex. 4, Day 2, pp. 304:3-7, 306:17-20; Ex. 5, Day 2, p. 74:9-12; Ex. 6, p. 258:20-23; Ex. 8 p. 175:19-176:3, 216:17-22; Ex. 9, March 30, 2017 ("Day 2") p. 272:20- 23; Ex. 12, ¶ 1) Plaintiff admits that he has no firsthand knowledge that any of the individual Defendants, other than Sheriff Dart, according to Plaintiff, knew that he ran for political office and was elected a McHenry County Commissioner as a Republican "unless they read the newspaper." (Ex. 2, pp. 83:5-84:15)

**RESPONSE: Objection to the extent the statements mischaracterize Plaintiff's claim.**

**Subject to objections, disputed in part.**

**Plaintiff does not dispute that he testified that he did not advise any of the Defendants, other than Sherriff Dart, that he was a Republican or his election.**

**Plaintiff disputes that Defendants were, in fact, unaware of his political activity. See response to ¶ 20. The notion that Defendants did not understand that Plaintiff's election to the McHenry County Board meant that he was a Republican is not credible, especially for the individual defendants like Ways and Dyner who live in that area and claimed to privately "identify" as Republicans despite agreeing to work for a Democratic administration.**

6

22. Prior to filing this lawsuit, Plaintiff never met Undersheriff Whittler, Executive Director Ways, or Director Dyner. (Ex. 2, pp. 122:5-16, 125:5-22, 134:5-15) Plaintiff's only interaction with Investigator Collins was through his OPR interview and Plaintiff only "probably" met Investigator Hemphill once before his OPR interview either on patrol or at the police academy. (Ex. 2, pp. 128:24-129:13, 130:15-131:14) Plaintiff's allegation that the individual Defendants discriminated against him and others on the basis of politics is because "[t]hat's what happened over the years at the Sheriff's office. It's always worked that way." (Ex. 2, p. 142:8-19)

**RESPONSE: Objection to the extent the statements mischaracterize Plaintiff's claim. Subject to objections, undisputed.**

### PLAINTIFF'S INJURY AND DISABILITY LEAVE

23. In September 2008, Plaintiff was injured in a motor vehicle accident, a head-on collision, while on duty as a patrol officer. (Ex. 1, ¶ 35; Ex. 2, p. 89:16; Exhibit 11, Administrative Review Record, p. 00512:9-00513:33)

**RESPONSE: Undisputed.**

24. As a result of the accident, Plaintiff suffered injuries to his neck and right shoulder. (Ex. 2, pp. 89:17-23; Ex 11, p. 00513:4-7) Specifically, Plaintiff had two fractures to the spinal segment in his neck and injured his shoulder to such an extent that he needed a prosthesis cap on the humeral head of his right shoulder. (Ex 2, p. 89:17-23; Ex 11, p. 00513:4-7, 00520:1-7)

**RESPONSE: Undisputed.**

25. On September 10, 2008, as a result of the above injuries, Plaintiff was unable to work as a patrol officer and went out on disability leave. (Ex 11, p. 00513:4-11, 00515:5- 00516:1, 00557:2-17)

**RESPONSE: Undisputed.**

26. While out on disability leave unable to work as a patrol office, Plaintiff collected temporary total disability payments for more than two (2) years. (Ex 11, p. 00513:4-00514:8; Ex. 14, ARDC Records, In re Robert Bless, Commission No. 2013PR00122, pp. 1-2, 11-15, 17-21.)

**RESPONSE: Undisputed.**

27. Plaintiff's treating neurosurgeon, Dr. Foroohar, indicated to Plaintiff that he should not drive in October and November 2008. (Ex 11, p. 00515:5-21, 00517:19-00518:2)

**RESPONSE: Objection, relevance. There is no evidence that Plaintiff was driving until February 2009 after he had sufficient ability to drive. (¶ 120.)**

**Subject to objections, undisputed.**

28. Plaintiff needed to be able to drive to work as a police officer. (Ex 11, p. 518:17-24) .

**RESPONSE: Objection, relevance. There is no evidence that Plaintiff was driving until February 2009 after he had sufficient ability to drive. (¶ 120.)**

**Subject to objections, undisputed.**

29. In December 2008, Dr. Foroohar again advised Plaintiff to avoid driving, among other restrictions. (Ex 11, p. 00523:18-524:12, 00523:9-23)

**RESPONSE: Objection, relevance. There is no evidence that Plaintiff was driving until February 2009 after he had sufficient ability to drive. (¶ 120.)**

**Subject to objections, undisputed.**

30. Plaintiff was also examined by another neurosurgeon who performed an independent assessment of Plaintiff for the Cook County Department of Risk Management, the County Department, which is not part of the Sheriff's Office, responsible for managing Plaintiff's disability payments while Plaintiff was on medical leave. (Ex 11, p. 00532:7-17, 00535:21-24, 00537:17-23, 00605:8-15) This second neurosurgeon, Dr. Sean Salehi ("Dr. Salehi"), met with Plaintiff for the first time on November 11, 2008. (Ex 11, p. 00532:7-17, 00535:21-24, 00537:17-23, 00604:8-14, 00606:5-19) Plaintiff was not cleared to drive at that time. (Ex. 11, p. 00611:19-21)

**RESPONSE: Undisputed.**

31. Plaintiff also saw Dr. Salehi on January 30, 2009. (Ex 11, p. 00539:10-19, 00612:6-00613:1,00860-00863) Plaintiff reported to Dr. Salehi at that time that his neck pain felt worse since physical therapy. (Ex 11, p. 00540:21-00541:3). Dr. Salehi subsequently prepared a report to the Cook County Department of Risk Management as to his assessment of Plaintiff on January 30, 2009, indicating that Plaintiff should refrain from driving until Plaintiff's therapist felt his range of motion was adequate enough to drive. (Ex 11, p. 00542:19-24, 00615:24-00616:5) Dr. Salehi indicated in his report that Plaintiff should not be driving at that time because he felt Plaintiff would not be able to see blind spots while driving and was concerned that Plaintiff could not drive safely without an improvement to his range of motion. (Ex. 11, p. 00615:24-00616:16)

**RESPONSE: Undisputed.**

32. Plaintiff later reported to Dr. Salehi that he began driving at the end of February when some of his range of motion had returned in his neck. (Ex. 11, p. 00618:12-16)

**RESPONSE: Undisputed.**

33. Plaintiff also saw a physical therapist for his injuries beginning in September 2008 and continuing until August 2010. (Ex 11, p. 00308:9-15, 00310:4-00311:14) From January 2009 through March of 2009, Plaintiff continued to experience neck pain and reported to his therapist on several occasions that there was no change as far as the condition of his neck. (Ex 11, p. 00544:23-00550:12) Plaintiff also reported to his therapist on May 11, 2009, that driving can cause him increased pain. (Ex 11, p. 00556:11-16)

**RESPONSE: Undisputed.**

34. Plaintiff's physical therapist did not tell Plaintiff he could drive because such a decision would have been within the purview of Plaintiff's physician. (Ex 11, p. 00360:12-19, 00363:8-20)

**RESPONSE: Objection, these facts mischaracterize the evidence.**

**The evidence about Plaintiff's driving restrictions is that: (1) in October 2008, Plaintiff's treating physician recommended, among other things, that he refrain from driving as he was still wearing a neck brace and his neck was fragile (AR 517-18, 523-24); (2) in mid-December 2008, Plaintiff was able to remove his neck collar and begin physical therapy to improve the range of motion in his neck (id. at 540); (3) in January 2009, Dr. Salehi, a non-treating physician who was hired by Risk Management for purposes of providing an independent medical examination for Plaintiff's workers' compensation case, recommended that Plaintiff should refrain from driving until Plaintiff's physical therapist felt his range of motion was adequate for driving (id. at 542); (4) Dr. Salehi, Risk Management's doctor, never told Plaintiff that he was restricted from driving (id. at 632); (5) in January 2009, the CCSO hired a private investigator to conduct surveillance to determine whether Plaintiff was driving (id., at 462-64, 468); (6) the investigator first observed Plaintiff driving in February 2009 (id. at 468); (7) Plaintiff testified that he began**

9

driving in February 2009 (id. at 543); (8) at the time Plaintiff began driving, there were no medical restrictions that prohibited him from driving (id. at 587-88); and (9) in May 2009, Plaintiff informed Dr. Salehi that he began driving in February 2009 when he regained some range of motion back in his neck (id. at 618, 625); and (10) in Dr. Salehi's opinion, there was nothing wrong with Plaintiff driving in February 2009 as his review of the video surveillance of Plaintiff driving in February 2009 showed that Plaintiff's range of motion had improved such that he was capable of driving. (id. at 620-22).

Risk Management's doctor, Dr. Salehi, was the one who stated that Plaintiff's therapist should let Plaintiff know that he had sufficient ability to drive.

35. By March of 2009, while still receiving disability benefits and not cleared to drive by his physicians, Plaintiff had been driving to work as a McHenry County Commissioner and also working as an attorney but had not sought to return to work as a Sheriff's police officer. (Ex 11, p. 00559:17-00560:16; Ex. 2, pp. 86:21-89:7) Additionally, Plaintiff admits he had not received approval to work either secondary jobs at that time. (Ex 11, p. 00560:17-00561:4)

RESPONSE: Disputed in part.

The evidence shows that Plaintiff requested light-duty work but was told there were no positions to accommodate his light-duty restriction which Defendant Nolan testified would not be unusual.  (¶101-103.)

The last sentence mischaracterizes the evidence.  The evidence is that Plaintiff did not hear back from the CCSO on the secondary employment applications he submitted.

### RISK MANAGEMENT INVESTIGATION

36. On or about February 2009, Cook County Risk Management, not the Sheriff's Office, contracted with a private investigation firm, Advanced Research Group, to conduct surveillance of Plaintiff. (Ex. 11, p. 00458:13-00460:5, 00462:20-00463:11; Ex. 12, ¶ 2).

RESPONSE: Undisputed.

37. Advanced Research Group conducted surveillance of Plaintiff for several months beginning in February of 2009 for the purpose of documenting Plaintiff's activities (Ex 11, p. 00463:12-00465:1, 00466:18-00467:19, 00709-00755). The surveillance was conducted by an independent, licensed private detective. (Ex 11, p. 00480:5-10)

**RESPONSE: Undisputed.**

38. In particular, the surveillance conducted by Advanced Research Group at the behest of Cook County Risk Management, had the objective of determining whether Plaintiff was driving in violation of the stated medical restrictions preventing him from working as a Police Officer. (Ex 11, p. 00465:16-20). Advanced Research Group documented its observations of Plaintiff in a series of investigative reports. (Ex 11, p. 00465:12-15, 00466:18-00467:19; , 00709-00755) Advanced Research Group also recorded video of Plaintiff's physical activities. (Ex 11, p. 00466:3-10)

**RESPONSE: Objection.**

**The facts in this paragraph, including the findings of Risk Management's investigator, should be disregarded and stricken because they are not admissible under FRE 401 as irrelevant because, among other reasons, there is no evidence that at the time of these events Plaintiff had a driving restriction or that Plaintiff was physically able to return to work even if he was driving and notwithstanding his observed activity. (¶¶94-95, 98, 101-03; 113, 119-120.) There is no evidence Plaintiff's driving impacted his IOD status or his ability to return to work. (Id.) There is no evidence that Plaintiff's driving or observed activity impacted the workers' compensation benefits he was entitled to receive under the circumstances. (Id.) The evidence shows Defendants knew Plaintiff was not physically able to return to work, even if he was driving and regardless of his observed activity. (Id.) There is no evidence that Plaintiff did not regain the ability to drive after January 30, 2009, when the recommendation was made. (¶ 113.) Even if relevant, at trial, this evidence is subject to exclusion as unfairly prejudicial under FRE 403.**

**The facts in this paragraph, including the findings of Risk Management's investigator, should be disregarded and stricken because they are not admissible under FRE 404(b) as improper character evidence.**

**The facts in this paragraph, including the findings of Risk Management's investigator, should be viewed in the light most favorable to Plaintiff.**

**Subject to objections, undisputed.**

39. On February 2, 2009, Plaintiff was observed by the Advanced Research Group investigator driving around his neighborhood. (Ex 11, p. 00709-00710)

**RESPONSE: Objection. See ¶ 38.**

**Subject to objections, undisputed.**

40. On February 7, 2009, Plaintiff was observed by the Advanced Research Group investigator driving once again. (Ex 11, p. 00469:22-00470:24, 00715-00716)

**RESPONSE: Objection. See ¶ 38.**

**Subject to objections, undisputed.**

41. On March 6, 2009, Plaintiff was observed by the Advanced Research Group investigator driving forty-five and one half (45.5) miles. (Ex 11, p. 00475:10-00476:20, 00723-00724)

**RESPONSE: Objection. See ¶ 38.**

**Subject to objections, undisputed.**

42. On May 11, 2009, Plaintiff was observed by the Advanced Research Group investigator driving to the McHenry County Administrative Building in Woodstock, Illinois from his residence in Fox River Grove, Illinois. (Ex 11, p. 00465:2-11, 00477:2-24, 00742-00744)

**RESPONSE: Objection. See ¶ 38.**

**Subject to objections, undisputed.**

43. On May 18, 2009, Plaintiff was observed by the Advanced Research Group investigator driving to both the McHenry County Government Center and the McHenry County Administrative Building in Woodstock, Illinois and then to another location, originating from his

residence in Fox River Grove, Illinois, traveling approximately sixty-four (64) miles. (Ex. 11, p. 00465:2-11, 00478:15-00479:13, 00749-00751)

**RESPONSE: Objection. See ¶ 38.**

**Subject to objections, undisputed.**

## OPR INVESTIGATION

44. On April 9, 2009, Personal Director Nolan was notified by Lisa Walik ("Walik"), the Director of Risk Management of the Cook County Department of Risk Management that Plaintiff was on Injured on Duty ("IOD") status and working as a McHenry County Board member and lawyer. Walik also reported that Plaintiff had driving restriction documents on file with Risk Management but that Risk Management had Plaintiff under surveillance with information that he was driving. (Ex. 9, Day 1, pp. 136:23-137:17, Day 2, pp. 273:22-274:5; Ex. 11, 00792)

**RESPONSE: Disputed in part.**

**Plaintiff did not have "driving restrictions on file" that prevented him from driving in April 2009. (¶120.)**

45. After receiving this information from Walik of Cook County Risk Management, Personnel Director Nolan drafted a memorandum to Executive Director Ways relaying the above information, advising Executive Director Ways to take the necessary action he might deem appropriate. (Ex. 9, Day 1, pp. 136:23-137:17, Day 2, p. 273:22-274:5; Ex. 11, p. 00792)

**RESPONSE: Undisputed.**

46. On or about April 9, 2009, Bonnie S. Heraty, Claims Adjuster for the Cook County Department of Risk Management advised Chief Holbrook by letter that Plaintiff was out on duty injury since September 10, 2008, and was driving and working two (2) additional jobs even though his treating physician indicated he could not work or drive. (Exhibit 15, Holbrook Notification and Memorandum, p. 1; Ex. 6, pp. 270:17-272:21; Ex. 7, pp. 229:19-230:9)

**RESPONSE: Undisputed.**

47. On April 14, 2009, Chief Holbrook authored a memorandum to Executive Director Ways stating that his office was informed that Plaintiff, who was on duty injury status, did not have a secondary employment request on file. (Ex. 6, pp. 270:17-272:21; Ex. 15, p. 2) Chief Holbrook had an obligation to report the information he received from Cook County Risk Management to the OPR, which has the responsibility within the Sheriff's Office to investigate potential wrongdoing of Sheriff's Office employees. (Ex. 6, pp. 278:6-279:24).

13

**RESPONSE: Undisputed.**

48. An OPR case was initiated following the information provided by Risk Management. (Ex. 4, Day 1, pp. 192:8-16, 195:11-197:8)

**RESPONSE: Undisputed.**

49. Investigator Collins was the primary OPR Investigator assigned to Plaintiff's case after another OPR investigator initially handled the matter, and OPR Investigator Hemphill provided assistance. (Ex. 7, p. 128:9-129:9, 144:6-21; Ex. 8, p. 16:6-9, 164:22-165:16)

**RESPONSE: Undisputed.**

50. The OPR investigation determined that Plaintiff did not submit a request for approval to work secondary employment as a McHenry County Commissioner before he began working as a McHenry County Commissioner in 2008, and Plaintiff has admitted this fact. (Ex 11, p. 00498:24-00499:16, 00685-00688)

**RESPONSE: Undisputed.**

51. Plaintiff claims he submitted a request for approval to work secondary employment as a McHenry County Commissioner and as a lawyer in the winter of 2009, while he was off work on disability leave, by giving the requests to his supervisor at a Dunkin Donuts in Palatine, Illinois. (Ex 11, p. 00499:17-00500:1, 00506:21-00508:11) However, the record reflects that Plaintiff failed to offer this explanation to Investigators Collins and Hemphill when they interviewed him, and there is no record of Plaintiff having submitted such requests. (Ex. 11, pp. 00024-00028, 00508:12-16, 00511:6-00512:4, 00685-00688, 00699-00700; Ex. 7, p. 156:4-8, 177:24-178:8, 218:11-23, 220:22-221:4; Ex. 2, pp. 103:1-22, 206:11-207:16; Ex. 14, p. 8, 13-14) Plaintiff also admits he never received approval to work either secondary employment positions. (Ex 11, p. 00024-00028, 00500:2-00501:17; 00511:6-14, 00685-00688; Ex. 2, p. 106:3-12).

**RESPONSE: Disputed in part.**

**These facts mischaracterize the circumstances regarding Plaintiff's submissions of secondary request forms generally and in particular in January 2009.  (¶ 82-83, 91, 100, 104.)**

**Defendants have lost the secondary employment forms it maintained so it should be barred at the summary judgment stage from asserting  facts based on inferences from the documents they lost.  (¶91, 97-98.)**

14

The evidence is that Plaintiff was not notified that his secondary employment request forms were denied or his permission to work secondary employment would be denied. There was no evidence that Defendants would have denied Plaintiff's secondary employment forms even if they were submitted as Plaintiff claimed.

There is no evidence that Defendants Collins or Hemphill asked Plaintiff about the submission of secondary employment forms to Sgt. King in January 2009.

52. Plaintiff returned from disability leave to his job as a Sheriff's police officer in November 2010, more than two (2) years after his accident and only after County Risk initiated its investigation of him. (Ex. 2, p. 91:5-10)

RESPONSE: Disputed in part.

The evidence is that Plaintiff returned to work in November 2010 after he was medically cleared to do so. (¶ 103-04.)

There is no evidence that Plaintiff returned to work "after County Risk initiated an investigation of him" and the citation does not support the assertion.

The evidence is that Plaintiff first learned of the investigation in May 2011 when OPR interviewed him. (¶ 114.)

53. It was not until November 23, 2010, after County Risk and OPR initiated their investigations of him that Plaintiff, for the first time, requested to work secondary employment to work as a McHenry County Commissioner. (Ex 11, pp. 00509:18-00511:14).

RESPONSE: Disputed in part.

The evidence is that Plaintiff returned to work in November 2010 after he was medically cleared to do so. (¶ 103-04.)

There is no evidence that Plaintiff returned to work "after County Risk and OPR initiated their investigation of him" and the citation does not support the assertion.

15

**The evidence is that Plaintiff first learned of the investigation in May 2011 when OPR interviewed him. (¶ 114.)**

54. Plaintiff knew that it was his responsibility to renew his request to work secondary employment every year, which involved filing a secondary employment request form. (Ex 11, p. 00502:3-10) Plaintiff also knew that a secondary employment form needed to be filled out and approved by supervisors for him to be able to work secondary employment. (Ex 11, pp. 00505:21-00506:12). A copy of such approval by supervisors would have been returned to Plaintiff upon such approval, which serves as notice to Plaintiff that he had approval to work the requested secondary employment. (Ex 11, p. 00506:6-16)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes Plaintiff's deposition testimony.**

**Plaintiff disputes that the secondary employment policy was strictly followed or enforced. The evidence is that there was "lax" enforcement of the secondary employment policy. (See Ex. 52, p. 6 & 8 [union grievance decision]; (Ex. 2 [Ways Dep.], p. 145, 162-63) The evidence shows that, in 2010, Plaintiff did not receive his approved forms back from the CCSO until six months after he submitted them. (AR 510-511.)**

55. Plaintiff had submitted a request to work secondary employment as an attorney for the calendar year 2008 and understood the approval process. (Ex 11, p. 00505:3-20 00702-00703)

**RESPONSE: Undisputed.**

56. In the course of OPR's investigation of Plaintiff, OPR investigators contacted both the Sheriff's Office's Personnel Department and the Police Department to determine whether Plaintiff had approved secondary employment requests on file to work as a McHenry County Commissioner and as an attorney during the period he was out of work on disability leave. (Ex. 7, p. 142:5-15, 175:13-176:2, 243:8-13; Ex. 8, pp. 190:15-23, 191:10-192:1) The Personnel Department received approved secondary employment requests during that time period and maintained copies of those requests. (Ex. 9, Day 1, p. 105:18-106:20, 108:17-109:11) The Personnel Department did not have record of any active secondary employment requests on file for Plaintiff covering the period of January 31, 2009, to December 9, 2010. (Ex 11, p. 00439:1-6) Additionally, during the course of OPR's investigation, Chief Holbrook's administrative assistant sent the secondary employment request forms the Sheriff's Police Department had on

file for Plaintiff (Ex. 6, pp. 195:3-196:4). Those forms did not include requests for the year 2009 and only one for the year 2008. (Ex. 6, p. 197:11-15)

    **RESPONSE: Disputed in part.**

    **Plaintiff does not dispute that the paragraphs accurately summarizes the deposition testimony provided by these witnesses.**

    **Plaintiff disputes the testimony is reliable or credible. The evidence showed that Nolan and Holbrook provided untrue information and withheld material facts. (¶ 91-93, 115, 117, 135-39.)**

    57. Following the completion of OPR's investigation, OPR's findings and recommended discipline with respect to Plaintiff were reviewed and affirmed in Command Channel Review by Executive Director Ways, Chief Holbrook, and Undersheriff Whittler in July 2011. (Ex. 11, 00682; Ex. 3, pp. 5:18-6:6; Ex. 4, Day 1, pp. 169:20-172:8; Ex. 6, pp. 98:3-6, 165:9-16)

    **RESPONSE: Undisputed.**

    58. One of Undersheriff Whittler's primary responsibilities at the Sheriff's Office is to perform the Command Channel Review of OPR cases. (Ex. 3, p. 19:15-23) Sheriff Dart did and does not direct Undersheriff Whittler's decision-making process related to Command Channel Review and had and has no personal involvement in the Command Channel Review process generally, including with respect to Plaintiff's OPR case. (Exhibit 13, Undersheriff Whittler's Answers and Objections to Plaintiff's Second Set of Interrogatories, ¶ 5; Ex. 12, ¶ 2)

    **RESPONSE: Disputed in part.**

    **Plaintiff does not dispute that the paragraphs accurately summarizes the testimony provided by Defendant Whittler.**

    **Plaintiff disputes the testimony is reliable or credible. (¶127-34, 137.)**

**RELEVANT GENERAL ORDERS**

    59. Cook County Sheriff's Office General Order 07-2, "Secondary Employment," was in effect at the time Plaintiff was on disability leave from the Sheriff's Office. (Ex. 11, pp. 00914-00922) General Order 07-2 provides that before an employee can accept or commence any secondary employment, he or she must receive permission through the chain of command from his or her Department Head. (Ex. 11, p. 00915) General Order 07-2 further provides that an employee's approved secondary employment should be suspended if an employee is on a medical leave of absence. (Ex. 11, pp. 00916-00917)

17

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes certain provisions of the secondary employment policy.**

**Plaintiff disputes that the summary is accurate or complete. (¶ 86-93.) The policy does not say that "an employee's approved secondary employment should be suspended if an employee is on a medical leave of absence." IOD is not a restriction in the policy. The policy states that the supervisor is to request suspension, which triggers the "continual review" to ensure secondary employment should continue to be approved. There is no rule prohibiting secondary employment while on IOD, provided that secondary employment does not violate medical activity restrictions. (¶87, 89.)**

**PLAINTIFF'S TERMINATION**

60. On October 6, 2011, the Sheriff's Office, by Undersheriff Whittler, filed a Complaint against Plaintiff at the Merit Board, alleging that (1) on or about September 10, 2008, as a result of a duty incident, Plaintiff went on the Medical Rolls-Injured On Duty; (2) Plaintiff's treating physician reported that Plaintiff could not work or drive; (3) Plaintiff had received temporary disability checks from the Cook County Insurance Benefit Fund; (4) that while on the Medical Rolls-IOD, Plaintiff had been employed as both a McHenry County Commissioner and as an attorney; (5) Plaintiff was not authorized to work secondary employment; and (6) Plaintiff falsely reported to OPR investigators that he had secondary employment requests on file including for the period he was out on leave. (Ex. 11, pp. 00018-00023)

**RESPONSE: Undisputed.**

61. Merit Board Commissioners Lance C. Tyson and James Nally heard evidence presented by Plaintiff, thought counsel, pursuant to a Merit Board trial that commenced on November 13, 2012, and concluded on January 29, 2013. (Ex. 11, p. 00024-00028; Ex. 2, p. 108:4-14). After evaluating the credibility of witnesses and supporting evidence, on May 3, 2013, the Merit Board issued its decision in Plaintiff's Merit Board case, finding that "(1) [Plaintiff] was not authorized to engage in secondary employment at any time while receiving temporary disability checks from the Cook County Insurance Benefit Fund; (2) [Plaintiff's] Department Head nor designee gave authorization to [Plaintiff] to engage in secondary employment in 2009 through and including November 23, 2010; [and] (3) [Plaintiff] falsely reported to investigators from the Office of Professional Review that he had a secondary employment request on file for his business, Bless and Associates, for each year including 2010.

(Ex. 11, p. 00024-00028) The Board indicated the egregious nature of Plaintiff's conduct, noting its conclusion that Plaintiff lied to continue to collect disability benefits while also working as a McHenry County Commissioner and attorney and driving against stated medical restrictions. (Ex. 11, p. 00027) Based on its findings, the Merit Board Ordered Plaintiff be terminated from employment with the Sheriff's Office effective October 6, 2011. (Ex. 11, p. 00027; Ex. 1, ¶ 44) Sheriff Dart did not communicate with Merit Board members about Merit Board hiring decisions, specific Merit Board hearings or specific Merit Board employment decisions, during the time period relative this present lawsuit and specifically as to Plaintiff or any employees accused of similar conduct as Plaintiff was found to have committed. (Ex. 12, ¶ 17).

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes aspects of the Merit Board proceedings.**

**Plaintiff disputes the summary as misleading and incomplete.  See also Pl. Mem. In Support of Administrative Review.  (Dkt. No. 291.)**

**Plaintiff disputes the last sentence is reliable or credible.**

### ARDC SUSPENDS PLAINTIFF'S LICENSE FOR SAME CONDUCT

62. On March 12, 2015, the Illinois Attorney Registration and Disciplinary Commission ("ARDC") suspended Plaintiff's license to practice law in the State of Illinois for three years and until further order of the Court. (Ex. 14, p. 16) This suspension of Plaintiff's law license was based on conduct including that while representing a widow with two young children in a wrongful death action, Plaintiff engaged in an intimate relationship with the client, entered into multiple improper business transactions with her involving obtaining a series of personal and business loans from her, and advised her to lie about their personal relationship at her deposition in the wrongful death action. (Ex. 14, p. 16; Ex. 2, p. 28:23-31:11). Plaintiff also made a false statement to the ARDC and testified falsely at his ARDC disciplinary hearing (Ex. 14, p. 16).

**RESPONSE: Objection.**

**The facts in this paragraph, including the findings of the ARDC and the suspension of Plaintiff's law license, should be disregarded and stricken because they are not admissible under FRE 401 as irrelevant because, among other reasons, the decision was issued after Plaintiff was terminated.  Even if relevant, at trial, this evidence is subject to exclusion as unfairly prejudicial under FRE 403.**

19

The facts in this paragraph, including the findings of the ARDC and the suspension of Plaintiff's law license, should be disregarded and stricken because they are not admissible under FRE 404(b) as improper character evidence.

The facts in this paragraph, including the findings of the ARDC and the suspension of Plaintiff's law license, should be disregarded and stricken because they are not material in summary judgment proceedings, where the facts are required to be viewed in the light most favorable to the non-moving party, as improper credibility evidence. Fed. R. Civ. P. 56.

Subject to objections, disputed in part.

Plaintiff does not dispute that Plaintiff's law license was suspended.

Plaintiff disputes the summary of the ARDC proceedings as being misleading and incomplete.

63. On November 2016, the Illinois Supreme Court upheld the ARDC's suspension of Plaintiff's license to practice law in the State of Illinois for one (1) year, with the suspension to run consecutively to the three (3) year and until further order of the Court suspension imposed on Plaintiff on March 12, 2015, described above. (Ex. 14, p. 21). The suspension of Plaintiff's law license for one (1) additional year was based on the same conduct for which Plaintiff was terminated by the Merit Board. (Ex. 14, pp. 1-2, 11-15, 17-21; Ex. 11, pp. 00018-00028)

RESPONSE: Objection.

The facts in this paragraph, including the findings of the ARDC and the suspension of Plaintiff's law license, should be disregarded and stricken because they are not admissible under FRE 401 as irrelevant because, among other reasons, the decision was issued after Plaintiff was terminated. Even if relevant, at trial, this evidence is subject to exclusion as unfairly prejudicial under FRE 403.

The facts in this paragraph, including the findings of the ARDC and the further suspension of Plaintiff's law license, should be disregarded and stricken because they are not admissible under FRE 404(b) as improper character evidence.

The facts in this paragraph, including the findings of the ARDC and the further suspension of Plaintiff's law license, should be disregarded and stricken because they are not material in summary judgment proceedings, where the facts are required to be viewed in the light most favorable to Plaintiff, as improper credibility evidence. Fed. R. Civ. P. 56.

Subject to objections, disputed in part.

Plaintiff does not dispute that the ARDC further suspended Plaintiff's law license.

Plaintiff disputes the characterization of the ARDC proceedings as misleading and incomplete. See also Ex. 18 [July 2016 Review Board Report].

### PLAINTIFF MEETS SHERIFF DART

64. According to Plaintiff, Jack Franks is an attorney out of McHenry County and an Illinois State Representative. (Ex. 2, 67:23-68:17) Plaintiff states that Franks "claims to be a Democrat" but openly supports the political campaigns of Republicans, including Plaintiff's political campaign for McHenry County Commissioner. (Ex. 2, p. 69:5-22) Plaintiff states that Franks is a mutual friend of Sheriff Dart and Plaintiff. (Ex. 2, pp. 67:23-68:2; 71:3-4, 73:2-12)

**RESPONSE: Undisputed.**

65. Plaintiff and Sheriff Dart spoke on one occasion, which Plaintiff claims was a political fundraiser for Franks in downtown of Chicago. (Ex. 2, pp. 66:24-67:22; Ex. 12, ¶ 1) Plaintiff states that his conversation with Dart started when Franks introduced him to Sheriff Dart and that he and Sheriff Dart spoke for several minutes alone. (Ex. 2, 72:17-73:1, 74:9-11; Ex. 12, ¶ 1) Plaintiff states that during the conversation, he and Sheriff Dart spoke about Plaintiff's September 2008 accident, Plaintiff's position on the McHenry County Board, and that Plaintiff was a Republican and an attorney. (Ex. 2, p. 73:13-17, 76:3-10) Plaintiff states that Sheriff Dart did not react when Plaintiff told Sheriff Dart that Plaintiff was a Republican, had been elected to the McHenry County Board, or worked as an attorney. (Ex. 2, p. 76:23-77:9, 77:23-10) Plaintiff and Sheriff Dart were just conversing at that point, and they went on to discuss other topics and make "small talk." (Ex. 2, pp. 74:17-75:5) Sheriff Dart recalls meeting Plaintiff one time at an office building with Jack Franks but does not recall the date, time or exact location. (Ex. 12, ¶ 1) Sheriff Dart recalls Plaintiff stating he worked for the Sheriff's

Office and was injured but does not recall any other comments made by Plaintiff during that brief encounter. (Ex. 2, p. 74: 17-75:21, 77:13-22, 79:19; Ex. 12, ¶ 1)

**RESPONSE: Undisputed.**

66. Plaintiff states that his conversation with Dart was not confrontational and ended when he and Sheriff Dart shook hands and said "nice to meet you." (Ex. 2, pp. 79:20-24, 80:1-6) Plaintiff states he and Sheriff Dart have not spoken since that conversation. (Ex. 2, pp. 80:4-81:1) Plaintiff states that during the conversation, Sheriff Dart told Plaintiff to let him know if there was anything he could do for him. (Ex. 2, p. 75:11-16; Ex. 12, ¶ 1)

**RESPONSE: Undisputed.**

## NO EVIDENCE OF DISCRIMINATION

67. As the Elected Sheriff of Cook County, Sheriff Dart is authorized to create, implement and enforce policies and practices of the Sheriff's Department. Sheriff Dart, however, has no personal involvement in the implementation and enforcement of such policies and practices. Sheriff Dart delegated that authority to high ranking staff, including Rosemarie Nolan (Director of Personnel/Human Resources), Joseph Ways (Executive Director of Office of Professional Review) and Zelda Whittler (Undersheriff). (Ex. 12, ¶ 2-11)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes the information provided in Sherriff Dart's interrogatory answers.**

**Plaintiff disputes that Sherriff Dart's interrogatory answers provide a basis for summary judgment.**

**For example, these statements contradict the Answer filed by defendants Sherriff Dart, Rosemarie Nolan (Director of Personnel/Human Resources), Joseph Ways (Executive Director of Office of Professional Review) and Zelda Whittler (Undersheriff) in which they denied that they were policymakers or decision-makers or that final policy-making authority was delegated to them by Sherriff Dart. (Dkt. No. 148 & 181 ¶ 10, 14, 16, 22). The CCSO Defendants specifically answered the complaint by stating that they "lacked information sufficient to form a belief" as to whether or not it was true that Sherriff Dart**

was a policy-maker for the CCSO. (**Id**. ¶ 10.) There is also evidence that, contrary to these assertions, all personnel moves, including whether to permit light-duty assignments, are made by Sheriff Dart. (¶ 121-22.)

68. Executive Director Ways is the former senior-most Assistant Special Agent in Charge at the Federal Bureau of Investigation's Chicago Office, and is a life-long Republican. (Ex. 4, Day 1, pp. 12:2-13:15, Day 2, p. 307:8-13). Executive Director Ways has never lived in Cook County, has never been eligible to vote for Sheriff Dart for Cook County Sheriff, and has not otherwise supported Sheriff Dart politically. (Ex. 4, Day 2, p. 309:6-311:5). Prior to joining the Sheriff's Office as the Executive Director of OPR, Executive Director Ways had only met Sheriff Dart once, at an FBI-related luncheon. (Ex. 4, Day 1, p. 14:7-15)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes testimony given by Defendant Ways.**

**Plaintiff disputes that Defendant Joseph Ways' contentions about his political affiliation are accurate or credible. (¶ 124-32, 111, 117, 140.)**

69. It was Executive Director's Ways decision to recommend the termination of Plaintiff's employment with the Sheriff's Office based on the findings of the OPR investigation. (Ex. 4, Day 2, pp. 123:18-125:3) However, only the Merit Board had the authority to terminate an individual from the Sheriff's Office. (Ex. 4, Day 2, pp. 316:22-317:13)

**RESPONSE: Objection. The last sentence is a legal conclusion.**

**Subject to objections, disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes testimony given by Defendant Ways.**

**Plaintiff disputes that Defendant Joseph Ways' testimony is credible or reliable. (¶ 124-32, 111, 117, 140.)**

70. Director Dyner, the former Special Agent in Charge responsible for supervising internal affairs investigations for the Office of Inspector General of the Department of Justice in Chicago is also a life-long Republican. (Ex. 5, Day 1, p. 15:11-22, Day 2, p. 74:19-24) Director Dyner has lived in Will County for twenty-one (21) years and therefore has never been eligible

to vote for Sheriff Dart for Cook County Sheriff, has never otherwise supported Sheriff Dart politically, and would not vote for Sheriff Dart even if he was eligible to do so. (Ex. 5, Day 2, p. 75-76) Prior to joining the Sheriff's Office, Director Dyner had never met Sheriff Dart. (Ex. 5, Day 1, p. 19:3-11) Director Dyner was asked by Executive Director Ways to join the OPR. (Ex. 5, Day 1, p. 19:3-6)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes the testimony given by Defendant Edward Dyner.**

**Plaintiff disputes that Defendant Edward Dyner's testimony is credible or reliable.**

71. Director Dyner was the supervisor of Investigators Collins and Hemphill and signed off on the OPR investigation of Plaintiff. (Ex. 7, p. 23:15-18; Ex. 8, p. 11:23-24; Ex. 5, pp. 35:9-36:7, 210:10-12, 238:24-239:12)

**RESPONSE:  Undisputed.**

72. No evidence exists reflecting that any the Defendants were aware, before being sued in this lawsuit, that Plaintiff was a Republican. (Ex. 3, pp. 118:23-119:3; Ex. 4, Day 2, pp. 304:3-7, 306:17-20; Ex. 5, Day 2, p. 9-12; Ex. 6, p. 258:20-23; Ex. 7, pp. 228:21-229:5; Ex. 8, pp. 175:19-176:3, 216:17-22; Ex. 9, Day 2, p. 272:20-23; Ex. 12, ¶ 1)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes the testimony given by the individual defendants.**

**Plaintiff disputes that the testimony is credible or reliable.  See ¶ 20.**

73. Plaintiff's only basis for his claim that all of the Defendants intentionally subjected him to unequal and discriminatory treatment on the basis of race, is that "[t]hey made the decisions against me because of those reasons and there could be no other reason why they did." (Ex. 2, pp. 176:16-177:8) None of the Defendants took any action with respect to Plaintiff, or even discussed taken any action with respect to Plaintiff, on the basis of his race. (Ex. 3, pp. 117:8-24; Ex. 4, Day 2, pp. 305:24-306:16; Ex. 5, Day 2, pp. 73:17-74:8; Ex. 6, pp. 257:20-258:19; Ex. 7, p. 229:6-9; Ex. 8, p. 225:11-13; Ex. 9, pp. 272:17-273:10)

**RESPONSE: Objection to the extent the statements mischaracterize Plaintiff's claim.**

**Subject to objections, disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes testimony given by Plaintiff.**

**Plaintiff disputes that Plaintiff's personal knowledge is the only basis for his claim.**

74. Plaintiff alleges that Officers Marlin Parks and Derreck Carrey, who are non-white, were both given written warnings for engaging in unauthorized secondary employment activities and were later promoted. (Ex. 1, ¶ 85) Specifically, Plaintiff claims, based on "common knowledge," that Officers Parks and Carrey were working secondary employment at a school while on duty and only received written warnings. (Ex. 1¶ 85; Ex. 2, pp. 173:8-174:22) However, the evidence adduced in discovery does not support that either Officers Parks or Carrey worked secondary employment while also on duty, that they lied about their secondary employment to OPR, or that they were on disability leave at the time of the incident. (Exhibit 16, Excerpts from OPR File No. 2007-01-081, pp. 35-42) Additionally, Officer Parks was suspended for his conduct as the supervisor of an officer who had engaged in a more egregious violation of the secondary employment policy. (Ex. 16, pp. 35-42)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes certain events with Marlin Parks (African-American), Conley Dyer (African-American) and Derreck Carrey (African-American).**

**Plaintiff disputes the summary as misleading and incomplete. Plaintiff also disputes that the differences between these cases case and Plaintiff's circumstances are immaterial and, in any case, support Plaintiff's claims.**

**Sgt. Marlin Parks supervised Conley Dyer and both of them were working unauthorized secondary employment at a high school along with Dyer. See Df. Ex. 16, p. 41-44. Dyer worked secondary employment at the high-school while he was scheduled on-duty at the CCSO. Id. p. 42.**

**Marlon Parks—a supervisor working unauthorized secondary employment who was supervising another employer (Dyer) who was also working unauthorized secondary**

employment with him at the high school—was only suspended for 2 days, with options, for

his conduct.  Id. p. 44.  Dyer was only suspended for 30 days for his conduct.  Id.

75. Plaintiff alleges that former Sheriff's Officer Antonio McDonald had political "clout" or otherwise supported Sheriff Dart politically or was politically aligned with him because Officer McDonald was found to have engaged in unauthorized secondary employment for a period of approximately nine years and, as a result of that conduct, was suspended for a period of 30 days and not terminated. (Ex. 1, ¶ 49-50) However, Officer McDonald did not work secondary employment while also on duty being paid by the County for his time working a second job. (Exhibit 17, Excerpts from OPR File No. 2010-0230, pp. 1-5) Additionally, no evidence has been adduced in discovery that Officer McDonald was politically aligned with Sheriff Dart, as the campaign contributor list subpoenaed by Plaintiff in this matter did not reflect Officer McDonald as a supporter of Sheriff Dart. (Exhibit 18, Friends of Dart List)

RESPONSE: Disputed in part.

Plaintiff does not dispute that this paragraph accurately summarizes portions of

Antonio McDonald's OPR file or that Antonio McDonald's name does not appear on the

list of Sheriff Dart's contributors.

Plaintiff disputes the summary as misleading and incomplete.  Plaintiff also disputes

that the differences between McDonald's case and Plaintiff's circumstances are immaterial

and, in any case, support Plaintiff's claims.

For example, these are not just allegations, Antonio McDonald did intentionally did

not submit secondary employment forms and, unlike Plaintiff, his misconduct persisted for

nine years causing him to miss court dates and jeopardizing prosecutions, conduct which

was far more egregious than Plaintiff's alleged conduct.  (Ex. 1 [Holbrook], p. 224-26; Ex.

21 [Hemphill Dep.], p. 141-150.)

Antonio McDonald, unlike Plaintiff, had been disciplined in the past for missing

court appearances.  (Ex. 21 [Hemphill Dep.], p. 144.)

26

Antonio McDonald gave false statements to OPR that he had submitted secondary employment forms. (Ex. 21 [Hemphill Dep.], p. 149.)

Antonio McDonald was not referred to the State's Attorney's Office for prosecution. (Ex. 21 [Hemphill Dep.], p. 151, 171.)

Edward Dyner claimed the discipline McDonald received was "consistent with past practices." (¶ 128.)

Henry Hemphill could not explain how the 30 days suspension with options is consistent with past practices or the discipline Plaintiff received. (Ex. 21 [Hemphill Dep.], p. 149-50, 197-198.)

Joseph Ways could not explain the reason why Antonio McDonald received only 30 days suspension with options, meaning he could use personal time to fulfill the suspension requirements. (Ex. 2 [Ways Dep.], p. 297-298; (Ex. 1 [Holbrook Dep.], p. 224.) Joseph Ways could not identify one instance that would confirm that the discipline given the Antonio McDonald was "consistent with past practices." (Id.) Joseph Ways could not identify the reason why Antonio McDonald was permitted to serve his discipline "with options." (Id., p. 301.)

Joseph Ways was asked to explain the difference between Plaintiff's discipline case and the Antonio McDonald discipline case and gave the following testimony:

Q. So what's the difference between McDonald's case and Bless's case?

MR. GOLDEN: Objection to the form of the question.

A. I have my thought, but I just want to confirm it before I state it on the record. I can't find what I'm looking for, but I don't know what the difference is between the two.

(Ex. 2 [Ways Dep.], p. 338-339.)

27

76. Plaintiff alleges that Sheriff's Officers Roger Shelton, John Praden, Maureen Moore had political "clout" or otherwise supported Sheriff Dart politically or was politically aligned with him. (Ex. 1, ¶ 51) Plaintiff further alleges that Officers Shelton, Praden, and Moore engaged in serious misconduct but Defendants did not bring charges for termination against them. (Ex. 1, ¶ 52; Ex. 2, pp. 149:21-150:3) Plaintiff's basis for asserting that these individuals had political "clout" is "common knowledge" and unspecified conversations he claims he had with Officers Praden and Moore 10 to 12 years ago. (Ex. 2, pp. 151:9-153:1) The misconduct Plaintiff alleges had nothing to do with secondary employment or making false statements to OPR or collecting disability. (Ex. 2, pp. 153:2-155:20) The campaign contributor list subpoenaed by Plaintiff in this matter did not reflect Officers Praden, Shelton, or Moore as supporters of Sheriff Dart. (Ex. 18)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that these officers do not appear on Dart's contributor list.**

**Plaintiff disputes that his knowledge of these circumstances is deficient. General knowledge in the community is strong circumstantial evidence knowledge These cases show a pattern and practice of political retaliation.**

77. Plaintiff alleges that Scott Kurtovich was the former Sheriff's First Assistant Executive Director who was found liable by a federal jury in August of 2012 for violating the First Amendment rights of Sheriff's employees but was not disciplined as a result because of politics. (Ex. 1, ¶¶ 53-57) Plaintiff, though, bases his allegations entirely on reading legal documents and on discussions with his attorney. (Ex. 2, p. 156:15-157:15)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that these statements summarize Plaintiff's deposition testimony.**

**The evidence of the jury verdict and punitive damage award against Kurtovich is publicly available and well-known information. See, e.g., Burruss v. Cook Cty. Sheriff's Office, No. 08 C 6621, 2013 WL 3754006, at \*1 (N.D. Ill. July 15, 2013). Evidence of Kurtovich's promotions are based on CCSO personnel records. (Ex. 31 [Kurtovich Employment History].) See also ¶ 133.**

78. Elleo Greene, Marlon Jones, Luis Santoyo, Robert Maxwell, Percy Taylor, and Tamara Wuerffel are current and former Sheriff's employees who filed lawsuits against the

Sheriff's Office claiming, inter alia, political discrimination and/or retaliation because they did not have political "clout" and/or because they were otherwise not aligned with Sheriff Dart politically. (Ex. 1, ¶¶ 58-68) These cases, though, do not involve secondary employment or making false statements to OPR or collecting disability and Plaintiff has no first-hand knowledge of the alleged facts to which he refers. (Ex. 2, pp. 113:4-12; 115:21-116:23, 159:15-24, 161:15-162:1, 163:7-164:11, 165:8-20)

**RESPONSE: Objection to the last sentence.**

**Plaintiff disputes that his knowledge of these circumstances is deficient. General knowledge in the community is strong circumstantial evidence knowledge These cases show a pattern and practice of political retaliation.**

**Subject to objection, disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes pending actions filed by CCSO employees against the CCSO for political reasons.**

**Plaintiff disputes the summary as misleading and incomplete.**

79. Plaintiff also alleges that a federal jury verdict in the case of Burruss, et al. v. Cook County Sheriff's Office, et al., Case No. 08 CV 6621 (N.D. Ill.) supports his claim that the Sheriff's Office has a widespread practice of political discrimination and/or retaliation. (Ex. 1, ¶ 69-72. Plaintiff's knowledge of the Burruss case is limited to his reading the newspaper and reading court documents. (Ex. 2, pp. 166:11-167:22)

**RESPONSE: Objection to the last sentence.**

**Plaintiff disputes that his knowledge of these circumstances is deficient. General knowledge in the community is strong circumstantial evidence knowledge These cases show a pattern and practice of political retaliation.**

**The evidence of the jury verdict against the CCSO is publicly available and well-known information. See, e.g., Burruss v. Cook Cty. Sheriff's Office, No. 08 C 6621, 2013 WL 3754006, at \*1 (N.D. Ill. July 15, 2013).**

80. In May 2011, following Command Channel Review by individuals including Undersheriff Whittler, Sheriff's Correctional Officer Aaron Patton was recommended for termination after it was determined that he had engaged in secondary employment while on

injured on duty status and then lied about it to OPR. (Exhibit 19, Excerpts from OPR File No. 2009-0095, pp. 5-10) Patton is African-American. (Ex. 19, p. 5)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes the OPR file relating to Aaron Patton. Plaintiff does not dispute the last sentence.**

**Plaintiff disputes the summary as misleading and incomplete. Patton's case is materially different than Plaintiff.**

**For example, unlike Patton, Plaintiff had years of approved secondary employment. (¶ 82-83, 100, 104.)**

**Unlike Patton falsely denied working secondary employment and he defrauded the CCSO by claiming he suffered a work injury working for the CCSO when, in fact, the injury was suffered at his second job. (Ex. 21 [Hemphill Dep.], p. 115-18.)**

**Patton was subject to a different secondary employment policy that specifically prohibited secondary employment while on IOD, unlike Plaintiff. See Df. Ex. 19, p. 10.**

**Patton was on IOD working secondary employment doing physical work as a security guard, unlike Plaintiff. See Df. Ex. 19, p. 12.**

**Patton had six prior suspensions in 2009 and 2010, unlike Plaintiff who had no discipline history. See Df. Ex. 19, p. 11.**

**Despite his offenses, Patton was not referred to the State's Attorney's Office for criminal charges. (Ex. 21 [Hemphill Dep.], p. 128, 171.)**

## PLAINTIFF'S RULE 56 STATEMENT OF ADDITIONAL FACTS

### Plaintiff's History with the CCSO

81.    From 1996 through 2008, Plaintiff had a successful 16-year career as a CCSO police officer and had no discipline incidents.  (AR 687; Ex. 20 [Collins Dep.], p. 162.)  Plaintiff worked in the Patrol Division and he was assigned to the Rolling Meadows area near his home. (Id.)    The CCSO described Plaintiff in his performance evaluation as a "hard-worker" who "meets or exceeds job standards" and who is in "total compliance" with CCSO policies and rules.  (Ex. 12 [Bless Performance Review], p. 2 & 3.)

82.    Since 1996, Plaintiff routinely submitted secondary employment forms that were approved for the part-time second jobs he worked.   (Ex. 4 [Bless Secondary Employment Request Forms]; AR 294, 934-49.)    Between 2004 and 2008, Plaintiff submitted secondary employment forms that were approved for his law practice.  (AR 292-93, 295, 297-98; Ex. 4 [Bless Secondary Employment Request Forms].)

83.    In 2004, Plaintiff graduated from law school and hoped to build, on a part-time basis, a small law practice doing real estate closings and small business transactions. (AR 488.) In 2006, Plaintiff's performance review noted that he "frequently helped other officers with legal issues due to law degree."   (Ex. 1 [Holbrook Dep.], p. 130-31; Ex. 12 [Bless Performance Review].)  DeWayne Holbrook had direct personal knowledge that Plaintiff was working as a lawyer actively representing clients while Plaintiff was working for the CCSO.  (Ex. 1 [Holbrook Dep.], p. 34-42, 176-77).

84.    In September 2008, a federal monitor was appointed under the Shakman Decree to monitor CCSO's employment actions, including its internal employee misconduct investigation performed by the CCSO department called the Office of Professional Review

(OPR).  (Ex. 2 [Ways Dep.], p. 48-49, 282.)  In December 2010, the CCSO was released from supervision by the federal monitor.  (Id.) In May 2011, an order was entered dismissing the CCSO from the Shakman case.  (Ex. 32 [Nolan Dep.], p. 88.)

85.     In 2008, Plaintiff ran for election as a Republican candidate to serve in public office as a Commissioner on the McHenry County Board.  (Ex. 3 [Bless Campaign pamphlets & signs].)  In support of his campaign, Plaintiff had public campaign events, like fundraisers, that were attended by several CCSO employees, including supervisor level employees, and one who was described as the "boss" of Maywood.  (Ex. 26 [Bless], p. 49-65; Ex. 3 [Bless Campaign pamphlets & signs].)  Plaintiff's campaign and election was covered by the media.  (Id.; Ex. 51 [Bless Press].)[1]  In November 2008, Plaintiff won the election. (AR 496-97).

## The CCSO Secondary Employment Policy

86.     The CCSO policy for employees who want to work second jobs requires them to submit secondary employment request forms to their first line supervisor who is then required to send the forms through the chain of command for review and approval.  (AR 1085 (¶ D), Ex. 11 [2007 Policy].)  Under the policy, CCSO retains the right to "continual and regular" review of secondary employment and the right to revoke permission for secondary employment.  (AR 1085-86.)  The policy states that supervisors will notify employees in writing regarding any actions taken on secondary employment forms.  (Id.)  The legitimate reasons for denying a secondary employment request involved conflicting or compromising department rules or regulations, like persistent absenteeism from CCSO duties.  (Ex. 20 [Collins Dep.], p. 108-09.)

87.     In 2005, the policy prohibited employees from maintaining secondary employment while on the medical roll (injured on duty status, or "IOD") unless expressly

---

[1] See, e.g., http://www.dailyherald.com/article/20120131/submitted/301319669; & http://mchenrycountyblog.com/2008/12/03/newly-elected-mchenry-county-board-members-sworn-in-2.

authorized in writing. (Ex. 10 [2005 Policy].) In 2007, the policy was changed and the new policy did not restrict an employee from being on IOD and working secondary employment. (Ex. 1 [Holbrook Dep.], p. 119; Ex. 11 [2007 Policy], Section VII, p. 4-5; Ex. 23 [Dyner Dep.], p. 132, 223-224, 238; Ex. 20 [Collins Dep.], p. 110.) The CCSO has no rule that precludes employees from working secondary employment while on IOD. (AR437-38; Ex. 32 [Nolan Dep.], p. 124). In 2013, the secondary employment policy was changed to expressly permit employees on IOD to work secondary employment. (Ex. 33 [2013 Policy], Section V, ¶ L, p. 4.)

88.     The policy requires supervisors to review secondary employment applications based on the change in an employee's status (e.g., IOD) and to request suspension of approved secondary employment through the chain of command to trigger chain of command review of secondary employment. (Ex. 2 [Ways Dep.], p. 164; Ex. 11, Section VI.F, p. 3 [2007 Policy]).

89.     During the relevant time period, the Personnel Department was never notified that secondary employment approval was revoked based on change in employment status, such as IOD. (Ex. 32 [Nolan Dep.], p. 122-23.) The Personnel Department was unaware of any employees who had their request for secondary employment denied because they were on IOD. (Ex. 32 [Nolan Dep.], p. 135.)

90.     It was common for employees to believe that the secondary employment request forms were approved when first or second line supervisor signed off on the form and approved it, even though the policy technically requires more signatures up the chain of command. (Ex. 23 [Dyner Dep.], p. 119, 121-22). The reason employees typically do not submit secondary employment forms is to be able to get paid with cash "under the table" so there is no record of the work. (Ex. 23 [Dyner Dep.], p. 136-137.)

3

91.     There was "lax" enforcement of the policy. (Ex. 52 [Grievance Opinion, p. 6 & 8.)  Initially, only department heads were required to keep and maintain paper copies of secondary employment forms.  (Ex. 32 [Nolan Dep.], p. 108-111).  The personnel department also began to keep paper copies of secondary employment forms.  Id.  The CCSO has lost and cannot find the paper copies of the secondary employment forms it maintained.  Id.  Plaintiff's personnel file was missing copies of Plaintiff's secondary employment forms.  (Ex. 20 [Collins Dep.], p. 209.)  In 2013, the CCSO for the first time began to track secondary employment forms electronically.  (Ex. 32 [Nolan Dep.], p. 216-217; Ex. 21 [Hemphill Dep.], p. 36-37.)

92.     When she was asked based on her knowledge and experience the reasons why Plaintiff would not have submitted secondary employment forms in 2009 or 2010 given that he submitted them every other year, CCSO Personnel Director and Rule 30(b)(6) witness Rosemarie Nolan stated that Plaintiff most likely "was on IOD and forgot to file the form."  (Ex. 32 [Nolan Dep.], p. 134-36.)  Rosemarie Nolan had no reason to believe that Plaintiff's secondary employment requests would have been denied in 2009 or 2010 for his work as a lawyer or McHenry County Board member.  (Id.)

93.     In 2013, of the 115 officer secondary employment forms that were submitted in the CCSO police department, only 2 were denied.  (Ex. 34 [secondary employment log]; (Ex. 32 [Nolan Dep.], p. 238-242.)  The only two employees who were denied (Plaintiff and David Barber) had pending Merit Board cases at the time.  (Id.)

## Cook County Risk Management Department

94.     The Cook County Department of Risk Management (Risk Management) handles worker's compensation claims for Cook County employees, including CCSO employees.  (Ex. 2 [Ways Dep.], p. 58; Ex. 1 [Holbrook Dep.], p. 163; Ex. 32 [Nolan Dep.], p. 34-41.)  Risk

Management has the authority to deny claims, to place employees in "injured on duty" status (IOD) and/or to revoke IOD status. (Ex. 5 [Employee Information for Injury On-Duty]; Ex. 32 [Nolan Dep.], p. 258-259.) Risk Management also has the authority to order the employee to return to work and report to the Cook County Medical Unit. (Ex. 5, p. 2; Ex. 32 [Nolan Dep.], p. 34-41.) Risk Management informs the CCSO on a regular basis of the status of employees on IOD and their related workers' compensation cases. (Ex. 32 [Nolan Dep.], p. 202.)

95.     Risk Management also has the responsibility to work with employees to return them to light-duty positions to accommodate medical restrictions from work injuries. (Ex. 6 [Sheriff's Employment Action Manual, Article T ¶ 10(b)(vi); Ex. 32 [Nolan Dep.], p. 70-71.) Light-duty assignments involve office-type administrative work. (Ex. 32 [Nolan Dep.], p. 57-58, 173-175.)

### **Plaintiff's Work Injury and Return to Work**

96.     In the Fall of 2008, Plaintiff was seriously injured in a car accident while he was on duty. On September 8, 2008, Risk Management placed Plaintiff on IOD status and paid Plaintiff benefits based on his medical activity restrictions from the accident that did not permit him to work full-duty as a patrol officer. (AR 435.) On September 12, 2008, the CCSO reviewed Plaintiff's "IOD Packet" and found it to be complete and accurate. (AR 1162.)

97.     Plaintiff's Department Head, Chief of Police DeWayne Holbrook, did not revoke or request suspension of Plaintiff's approved secondary employment and he could not identify any instances when approval to work secondary employment was revoked. (Ex. 1 [Holbrook Dep.], p. 121-28; Ex. 32 [Nolan Dep.], p. 122.)

98.     Risk Management never revoked Plaintiff's IOD status, nor terminated Plaintiff's workers' compensation benefits, nor identified any workers' compensation benefits Plaintiff was

not entitled to receive. (Ex. 15 [Barber], p. 619-20; Ex. 32 [Nolan Dep.], p. 137-138; Ex. 23 [Dyner Dep.], p. 224.) Risk Management never put forth any argument in Plaintiff's workers' compensation case to stop making payments to Plaintiff. (Id.)

99. Between September 2008 and February 2015, Risk Management paid Plaintiff's disability payments, medical bills and related expenses arising from his work injury. (Ex. 17 [Risk Management Pymt Summary]). Risk Management settled Plaintiff's works compensation case for $89,595. (Id.; Ex. 15 [Barber], p. 619-20.)

100. In January 2009, Plaintiff submitted to his supervisor, Sergeant Larry King (Sgt. King), two secondary employment forms, one for his law practice and one for his public service as a McHenry County Board Commissioner. (AR 449-500, 506-08.) Four separate witnesses— each of them current or retired CCSO police officer employees—corroborated Plaintiff's testimony about turning in secondary employment forms in 2009. (AR 372-374, 379-83 & 387-90.) Sgt. King signed an affidavit and testified that Plaintiff provided him with secondary employment forms for his part-time work for his law practice and public service as a McHenry County Board Commissioner. (AR 570-72, 580-81, 933; Ex. 9 [Sgt. King Affidavit].) Sgt. King confirmed that he "signed the forms and forwarded them through the chain of command." (Id.)

101. In 2009, Plaintiff was cleared to return to work in a "light duty" capacity, but the CCSO claimed that there were no "light duty" positions available for him. (AR 590-92). Sheriff Dart and his chief of staff determine whether an employee gets a light-duty assignment. (Ex. 1 [Holbrook Dep.], p. 134-36, 183.) It was not unusual for an employee to have the ability to work in a light duty capacity but that there would be no light duty positions available to fill. (Ex. 32 [Nolan Dep.], p. 147-148.)

102.     Patrol officers must meet certain physical-ability requirements to, among other things, chase suspects, make arrests, take custody of prisoners, and inspect crime scenes.  (Ex. 7 [Characteristics of the Position]; Ex. 32 [Nolan Dep.], p. 29, 56-57; Ex. 2 [Ways Dep.], p. 187). An employee who could drive, but who could not physically perform the other tasks of working as a patrol officer, could only return to work to perform light-duty work.  (Ex. 32 [Nolan Dep.], p. 140.))

103.     Between September 2008 and November 2010, Plaintiff had a medical restriction that precluded him from working full-duty patrol.  (Ex. 23 [Dyner Dep.], p. 171-172.)  Risk Management never directed Plaintiff to report for physical examination at the Cook County Medical Unit to assess his physical activity restrictions.  (Ex. 32 [Nolan Dep.], p. 264-66; Ex. 24 [Dyner Dep. II], p. 18-19.)  In November 2010, Plaintiff was cleared to return to work at full-duty capacity.  (Ex. 32 [Nolan Dep.], p. 204; Ex. 35 [Release for Duty Authorization].)

104.     On November 23, 2010, Plaintiff submitted two secondary employment forms (one for his part-time work as a lawyer, one for his part-time public service work as a McHenry County Commissioner) that were approved by, among other, Chief of Police DeWayne Holbrook.  (Ex. 1 [Holbrook Dep.], p. 149-50; Ex. 4 [Bless Secondary Employment Forms], p. CCSAO 1174-73; Ex. 43 [2010 Secondary Employment Forms].)   Plaintiff's secondary employment request forms were also approved in 2011. (Ex. 4 [Bless Secondary Employment Forms], p. CCSAO 1178-81.)

## OPR's "Investigation" of Plaintiff

105.     OPR claimed to have a standard way to conduct internal employee misconduct investigations, which was important to ensure that employees are treated fairly.  (Ex. 2 [Ways Dep.], p. 21-22; Ex. 23 [Dyner I], p. 28.)  OPR claimed to use written "Standard Operating

7

Procedures" (SOP) to conduct OPR investigations. (Ex. 14 [OPR Standard Operating Procedures]; Ex. 23 [Dyner I], p. 43-47, 52-53, 70-71, 92, 100-103; Ex. 20 [Collins Dep.], p. 40-48, 52-53, 65-66.) Many of provisions of the SOP were not followed. (Ex. 2 [Ways Dep.], p. 91, 99, 100-01, 103, 247-49; Ex. 23 [Dyner Dep.], p. 71-73, 100-103; Ex. 20 [Collins Dep.], p. 43-44, 52-53, 65-66). OPR Director Edward Dyner could not explain the reason why important provisions were not being followed. (Ex. 23 [Dyner Dep.], p. 73.)

106.   Initially, OPR pursued a criminal "investigation" of Plaintiff's purported wrongful receipt of IOD workers' compensation benefits while engaged in secondary employment. (AR 455.) In May 2009, OPR tried to get the State's Attorney's Office to bring felony charges against Plaintiff for the fraudulent receipt of IOD workers' compensation benefits from Risk Management, but in August 2009 the State's Attorney's Office declined to file criminal charges. (AR 454; Ex. 19 [Plaintiff's OPR File], p. SAO 1370.)

107.   On February 3, 2009, the CCSO obtained information from the internet about Plaintiff's part-time public service as a McHenry County Commissioner. (Ex. 19 [Plaintiff's OPR File], p. SAO 1220). In April 2009, the CCSO obtained information from the internet about Plaintiff's part-time law practice. (Ex. 19 [Plaintiff's OPR File], p. SAO 1222-1228)

108.   In November 2009, Sheryl Collins was assigned to work on Plaintiff's investigation. (Ex. 20 [Collins Dep.], p. 128.) Sheryl Collins could not explain what activity was taken on Plaintiff's investigation between August 2009 when criminal charges were declined and November 2009 when she was assigned. (Ex. 20 [Collins Dep.], p. 136.)

109.   There was no investigative activity on Plaintiff's case between August 2009 and May 2011. (Ex. 23 [Dyner Dep.], p. 206-207.) There was no explanation provided for why OPR decided to re-start the investigation in May 2011. (Ex. 21 [Hemphill Dep.], p. 199, 201.)

Plaintiff's investigation file does not contain the Work Plan, Activity Reports or Extension of Time Request documents that are required in the SOP. (Ex. 23 [Dyner Dep.], p. 184; Ex. 2 [Ways Dep.], p. 217).

110. Sheryl Collins testified that the reason there was no activity on Plaintiff's case between August 2009 and May 2011 was a "courtesy" to interview Plaintiff when he returned to work. (Ex. 20 [Collins Dep.], p. 138-139.) Sheryl Collins could not explain the reasons why there was no activity on the case between November 2010 (when Plaintiff returned to work) and May 2011 (when Plaintiff was first notified of the investigation). (Ex. 20 [Collins Dep.], p. 140.)

111. OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways and OPR Director Edward Dyner could not explain why there was no activity on Plaintiff's case between August 2009 when the State's Attorney's Office declined to press charges and May 2011 when Plaintiff was notified he was under investigation. (Ex. 23 [Dyner Dep.], p. 184-185, 206-07; Ex. 2 [Ways Dep.], p. 217).

112. Sheryl Collins testified it was important to communicate with the first line supervisor of an employee who was under investigation for violating policies, but she confirmed that OPR made no effort was made to communicate with Plaintiff's first line supervisor, Sgt. King. (Ex. 20 [Collins Dep.], p. 144-46.)

113. On January 30, 2009, Cook County's doctor stated Plaintiff should refrain from driving until his shoulder sufficiently healed. (Ex. 20 [Collins Dep.], p. 190.) Sheryl Collins admitted there is no evidence that Plaintiff was driving before January 30, 2009 and no evidence that Plaintiff's injury did not heal sufficient to enable him to drive after January 30, 2009. (Ex. 20 [Collins Dep.], p. 190-91.) Sheryl Collins made no effort to determine whether Plaintiff's

medical restriction would permit him to work full-duty patrol work even though he was seen driving.  (Ex. 20 [Collins Dep.], p. 186.)

114.    In May 2011, OPR first signed "administrative charges" against Plaintiff.  (AR 693, 695, 1110-11, 1262-63.)  On May 18, 2011, Plaintiff was notified for the first time that he was being investigated by OPR and accused of being on IOD status and working for McHenry County without an approved secondary employment form on file.    (Id.) Plaintiff's OPR investigation was based on the 2005 policy prohibiting secondary employment while on IOD. (Ex. 19 [Plaintiff's OPR File], p. 111 [SAO 1408].)

115.    OPR Investigator Henry Hemphill (Hemphill) testified that he investigated whether Plaintiff had approved secondary employment forms. (AR 449.)  Hemphill stated that OPR's initial case did not involve alleged violations of secondary employment policies.  (AR 455.)  Hemphill stated that OPR's investigation was originally a criminal matter and then an administrative case, which in his experience was unusual. (AR 454.)  Hemphill said he was told by Nolan's office and the Police Department that they could not locate secondary employment forms for Plaintiff other than the three Nolan claimed to find.  (AR 449-50.)

116.    Hemphill also testified about his interview of Plaintiff in his investigation.  (AR 442.) According to Hemphill, Plaintiff stated in his interview that he submitted secondary employment forms for his law practice each year—a statement that Hemphill claimed was "false" based on the information he was given. (AR 451.)

117.    OPR claimed that they did not know and were not informed of important material information about Plaintiff's case, including: (1) that in 2009 Plaintiff had requested a light-duty assignment while out on IOD but the CCSO advised Plaintiff there were no light-duty positions available (Ex. 2 [Ways Dep.], p. 351-52); (2) information about when in 2009 Plaintiff's

shoulder injury improved to the point that he was able to drive (Ex. 2 [Ways Dep.], p. 205-06); (3) that in November 2010 Plaintiff had submitted secondary employment forms that were approved before Plaintiff knew he was being investigated (Ex. 2 [Ways Dep.], p. 288-289); (4) that DeWayne Holbrook and Rosemarie Nolan gave untrue information to OPR and withheld material information from OPR; and (5) DeWayne Holbrook was, himself, in violation of the secondary employment policies when he provided information to OPR about the circumstances. (Ex. 2 [Ways Dep.], p. 336-37.)

### Plaintiff's Claim for Workers' Compensation Benefits

118.    Jeremy Schwartz, a Cook County Assistant State's attorney who handles Workers' Compensation matters, testified that a temporary total disability determination does not preclude an employee from working a second job depending on the situation. (Ex. 16 [Schwartz testimony]), p. 430-436). Scott Barber (Attorney Barber), a workers' compensation lawyer who represented Plaintiff testified that the Workers' Compensation Act allowed Plaintiff to have the McHenry County and attorney jobs while receiving temporary total disability benefits. (Ex. 15 [Barber], p. 611-12.) Attorney Barber further testified that, Cook County was not entitled to any reduction in the benefits it paid Plaintiff. (Ex. 15 [Barber], p. 613-17, 622, 674.)

119.    There is no evidence that Plaintiff received any workers' compensation benefits Plaintiff was not entitled to receive. (Ex. 2 [Ways Dep.], p. 348; Ex. 1 [Holbrook Dep.], p. 202, 243; Ex. 32 [Nolan Dep.], p. 136-137.)

120.    With respect to Plaintiff's driving, the evidence is that: (1) in October 2008, Plaintiff's treating physician recommended, among other things, that he refrain from driving as he was still wearing a neck brace and his neck was fragile (AR 517-18, 523-24); (2) in mid-December 2008, Plaintiff was able to remove his neck collar and begin physical therapy to

11

improve the range of motion in his neck (id. at 540); (3) in January 2009, Dr. Salehi, a non-treating physician who was hired by Risk Management for purposes of providing an independent medical examination for Plaintiff's workers' compensation case, recommended that Plaintiff should refrain from driving until Plaintiff's physical therapist felt his range of motion was adequate for driving (id. at 542); (4) Dr. Salehi, Risk Management's doctor, never told Plaintiff that he was restricted from driving (id. at 632); (5) in January 2009, the CCSO hired a private investigator to conduct surveillance to determine whether Plaintiff was driving (id., at 462-64, 468); (6) the investigator first observed Plaintiff driving in February 2009 (id. at 468); (7) Plaintiff testified that he began driving in February 2009 (id. at 543); (8) at the time Plaintiff began driving, there were no medical restrictions that prohibited him from driving (id. at 587-88); and (9) in May 2009, Plaintiff informed Dr. Salehi that he began driving in February 2009 when he regained some range of motion back in his neck (id. at 618, 625); and (10) in Dr. Salehi's opinion, there was nothing wrong with Plaintiff driving in February 2009 as his review of the video surveillance of Plaintiff driving in February 2009 showed that Plaintiff's range of motion had improved such that he was capable of driving. (id. at 620-22).

## **Plaintiff's Return to Work**

121.    When Plaintiff returned to work, CCSO used one of its limited employer-rights "free" moves to transfer Plaintiff from his from his long-time north side assignment near his home in Rolling Meadows to the far south side assignment of Markham on the third watch. (Ex. 1 [Holbrook Dep.], p. 77-80, 204; Ex. 13 [11-2-2010 Personnel Memorandum].)  All employee moves, including employer-rights moves need approval from Sherriff Dart or his chief of staff. (Ex. 1 [Holbrook Dep.], p. 211.)    In February 2011, Plaintiff was transferred back to Rolling Meadows for operational needs.  (Ex. 36 [2-8-11 Personnel Memorandum].)

122.     CCSO Chief of Police Dewayne Holbrook testified that Plaintiff was transferred allegedly for legitimate reasons because Markham was "short-staffed." (Ex. 1 [Holbrook Dep. Excerpts], p. 204.)  However, Defendants have conceded that there are no documents that exist to support Holbrook's explanation.  (Ex. 37 [e-mail].)  Sheriff Dart has admitted during a TV interview that he uses, and that he instructed others to use, employee transfers in order "to send a message" to employees.  (Ex. 1 [Holbrook Dep.], p. 213.)  Specifically, Sheriff Dart stated:

> Listen.  I have employees of mine who are nonunion that I have flexibility where I move.  **If they're not doing what I need them to do, they either get fired, or I can make their life tricky by transferring them to a different location to make their drives longer, things like that**."  I told [Cook County Chief Judge Timothy Evans], I said, "Look.  If you have a judge who lives out in the south suburbs and is very comfortable out in Markham but just doesn't perform . . . I suggested [moving the judge to] Rolling Meadows. . . . So there's many, many things you can do to send a message.

> (Id. (emphasis supplied).)

### Facts About Other Employees

123.     Dion Trotter (African-American) was on IOD and, when he was cleared to return to work, he was returned to his previous assignment.  (Ex. 32 [Nolan Dep.], p. 256-57.)  Dion Trotter has made political contributions to Sheriff Dart's campaigns.   (Ex. 38 [Dart Contributions List]; Ex. 55 [Trotter Political Donations].)

124.     Hubert Thompson (African-American) was investigated by OPR for working unauthorized secondary employment during his duty hours.  (Ex. 21 [Hemphill Dep.], p. 128-44; Ex. 24 [Dyner II Dep.], p. 64-69; Ex. 26 [Thompson Application]; Ex. 39 [Thompson OPR File].)  OPR made no effort to investigate allegations that employees were "covering" for Hubert Thompson by working hours for him while he worked secondary employment.  (Ex. 21 [Hemphill Dep., p. 137-138.]

125.    Hubert Thompson falsely told OPR investigators at his interview that he had submitted secondary employment forms that were approved, but none were found in his personnel file.  (Ex. 21 [Hemphill Dep.], p.  133-41, 171.)  Hubert Thompson was not charged with making a false statement to OPR and was not referred to the State's Attorney's Office for prosecution.

126.    Hubert Thompson only received a 10 day suspension for his conduct.  (Ex. 39 [Thompson OPR File], p. 1).  Hubert Thompson had a lengthy disciplinary history.  (Ex. 24 [Dyner II Dep.], p. 69-70; (Ex. 39 [Thompson OPR File], p. 8 (SAO 2703.) Hubert Thompson has made political contributions to Democrat political candidates.  (Ex. 26 [Thompson political donations].)  When asked why Hubert Thompson was not charged with giving a false statement to OPR, Henry Hemphill stated "It's hard to come up with an answer."  (Ex. 21 [Hemphill Dep.], p. 135.)

127.    Hubert Thompson was investigated by Henry Hemphill.  (Ex. 39 [Thompson OPR File], p. SAO 2704.).  OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways Sr. signed off on the investigation and the suspension recommended.  ((Ex. 39 [Thompson OPR File], p. 2 (SAO 2698.) Undersheriff Zelda Whittler (Defendant Whittler) signed off on the command channel review and concurred with the decision to terminate Plaintiff.  (Id.)

128.    Antonio McDonald (African-American) was investigated by Henry Hemphill. (Ex. 50 [McDonald OPR File & Application]).  OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways Sr. and OPR Director Edward Dyner signed off on the investigation and recommended 30 days suspension with options.  (Ex. 50 [McDonald OPR File & Application], p. SAO 2023.)  Edward Dyner wrote a memorandum that 30 days suspension with options was "consistent with past practices."  (Ex. 50 [McDonald OPR File & Application],

14

p. SAO 2014-15.) OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways and Undersheriff Zelda Whittler signed off on the command channel review and concurred with the decision to terminate Plaintiff. (Id.)

129. Felicia Sparkman (African-American) was investigated by OPR for violating secondary employment policies. (Ex. 40 [Felica Sparkman OPR File]; Ex. 22 [Sparkman Application].) Felicia Sparkman was found to have worked secondary employment after she was specifically told her request for approval to work secondary employment was denied for poor attendance. (Id., p. SAO1434.) Felicia Sparkman gave false statements at her OPR interview, but she was not charged with lying during her interview. (Ex. 24 [Dyner II Dep.], p. 58-61.)

130. Felicia Sparkman was only disciplined with a 4-day suspension with options, meaning she had the option to use personal or sick days to fulfill the suspension. (Ex. 24 [Dyner II Dep.], p. 57.) OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways and Undersheriff Zelda Whittler signed off on the command channel review and concurred with the suspension. (Ex. 40 [Felica Sparkman OPR File], p. SAO 1424.)

131. Tamika Smith (African-American) was investigated by OPR for violating secondary employment policies. (Ex. 41 [Tamika Smith OPR File]; Ex. 42 [Smith Application].) Tamika Smith was found to have worked secondary employment after she was specifically told her request for approval to work secondary employment was denied for poor attendance. (Id., p. SAO1558.) Tamika Smith gave false statements at her OPR interview, but she was not charged with lying during her interview. (Ex. 24 [Dyner II Dep.], p. 61-64.)

132. Tamika Smith was only disciplined with a 2-day suspension with options, meaning she had the option to use personal or sick days to fulfill the suspension. (Ex. 24 [Dyner II Dep.], p. 62.) OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways and

Undersheriff Zelda Whittler signed off on the command channel review and concurred with the suspension. (Ex. 41 [Tamika Smith OPR File], p. SAO 1578.)

### Facts Showing Defendants' Bias Credibility Issues

133.     The CCSO claims to have a "zero tolerance" policy against political retaliation. (Ex. 1 [Holbrook Dep.], p. 250; Ex. 24 [Dyner II Dep.], p. 111-12.)  After Scott Kurtovich was found guilty of violation the First Amendment rights of CCSO employees for political reasons for which punitive damages were awarded and upheld, Scott Kurtovich was promoted to the position of "Executive Director" where he remained employed until 2014. (Ex. 31 [Kurtovich Work History].)  Scott Kurtovich has made political contributions to many Democrat candidates, including Sherriff Dart and his former boss Democrat Michael Sheehan.  (Ex. 28 [Kurtovich Political Donations].)

134.     While the CCSO had a General Order that provides that it is a violation to discriminate or retaliate on the basis of political affiliation, a CCSO Rule 30(b)(6) designee, Peter Kramer, general counsel for the CCSO, testified that he did not know if the CCSO had a policy against political retaliation prior to July 2010 with the requirement that one be implemented as part of the Shakman Compliance. (Ex. 48 [Kramer Dep.], p. 4-14, 18)

135.     CCSO Director of Personnel and Rule 30(b)(6) witness Rosemarie Nolan made contributions to Sherriff Dart's political campaigns, signed petitions for Sherriff Dart, and attended fundraisers on his behalf.  (Ex. 27 [Nolan Political Donations]; Ex. 32 [Nolan Dep.], p. 71-78, 207-210.)  Rosemarie Nolan has made political contributions and engaged in the same type of activities for many other candidates for office who are Democrats, including Sherriff Dart's former superior Michael Sheehan.  (Id.)  Rosemarie Nolan's son goes to the same school as Sherriff Dart's son.  (Ex. 32 [Nolan Dep.], p. 89-90.)

16

136.     Rosemarie Nolan admitted that she knew it was unlawful to take employment actions based on political affiliation and race.  (Ex. 32 [Nolan Dep.], p. 77-79, 279.)     At Plaintiff's merit board hearing, Rosemarie Nolan gave false testimony that Plaintiff did not have any secondary employment forms on file other than in 2008 and 2010, purportedly because she could not find the other forms before she testified.  (Ex. 32 [Nolan Dep.], p. 127-132, 276-278).

137.     Undersheriff Zelda Whittler was appointed by Sherriff Dart and made contributions to his political campaign.  Zelda Whittler has made political contributions to other candidates for office who are Democrats.  (Ex. 8 [Whittler Political Donations]; Ex. 38 [Dart Political Contributions List], p. 3.)  Zelda Whittler admitted that she understood she was named individually as a defendant in the case, that it was unlawful to take employment actions against Plaintiff based on politics or race.  (Ex. 45 [Whittler Dep.], p. 5-6, 119.) Zelda Whittler took no steps to look into either the investigation of Plaintiff other than her command channel review or the allegations Plaintiff made.  (Id.)

138.     DeWayne Holbrook was appointed to be Chief of Police by Sherriff Dart.  (Ex. 1 [Holbrook Dep.], p. 20.)  DeWayne Holbrook has made financial contributions to several of Sherriff Dart's political campaigns and he has attended political fundraisers, signed petitions and knocked on doors canvassing for Sherriff Dart.  (Ex. 1 [Holbrook Dep.], p. 42-50)  DeWayne Holbrook has communicated with Sherriff Dart since he retired.  (Ex. 1 [Holbrook Dep.], p. 297.)  DeWayne Holbrook admitted that he understood he was named individually as a defendant in the case, that it was unlawful to take employment actions against Plaintiff based on politics or race.  (Ex. 1 [Holbrook Dep.], p. 54-55, 296-97.)

139.     DeWayne Holbrook violated General Orders when he did not take action on Plaintiff's secondary employment forms when his status changed, meaning he could have been in

17

trouble himself for not following policy if, in fact, CCSO enforced the policy strictly. (Ex. 23 [Dyner Dep.], p. 234-236.) DeWayne Holbrook signed off on the OPR investigation of Plaintiff without taking an independent look to confirm or corroborate that OPR got the investigation right. (Ex. 1 [Holbrook Dep.], p. 174-75.)

140. OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways was appointed to be Executive Director of OPR by Sheriff Dart. OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways admitted that he understood he was named individually as a defendant in the case, that it was unlawful to take employment actions against Plaintiff based on politics or race. (Ex. 2 [Ways Dep.], p. 330-331.) OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways is collecting a pension from Cook County. (Ex. 2 [Ways Dep.], p. 191)

141. Defendant Edward Dyner was hired by OPR Executive Director and CCSO Rule 30(b)(6) witness Joseph Ways and met with Sheriff Dart. (Ex. 23 [Dyner I], p. 22-26.) Edward Dyner admitted that he understood he was named individually as a defendant in the case, that it was unlawful to take employment actions against Plaintiff based on politics or race. (Ex. 23 [Dyner Dep.], p.57.)

142. Edward Dyner testified that it was important that the discipline imposed on employees was consistent, but that he had no access to the information to determine whether discipline was consistent. (Ex. 23 [Dyner Dep.], p. 241.) He made no effort to check and see if the discipline imposed on Plaintiff was consistent with discipline imposed on employees for engaging in similar conduct. (Id.) The only time he could recall when he made such an inquiry was for Antonio McDonald. (Id.)

143.     At least four Merit Board members contributed to Sherriff Dart's campaigns and signed off on the Merit Board's decision, including the member who presided over Plaintiff's Merit Board hearing. (AR 24-28; Ex. 30 [Tyson Political Donations]; Ex. 29 [Rosales Political Donations]; Ex. 46 [Dilicandro Political Donations] ; Ex. 47 [Riordan Political Donations].)

144.     Sheryl Collins (African-American) testified that she supported Sherriff Dart, but she did not make financial donations.  (Ex. 20 [Collins Dep.], p. 6, 86).  Sheryl Collins admitted that he understood he was named individually as a defendant in the case, that it was unlawful to take employment actions against Plaintiff based on politics or race.  (Ex. 20 [Collins Dep.], p. 87-89, 253-54, 262.)  In 2007 and 2009, Sheryl Collins was trying to get promoted to Sergeant. (Ex. 20 [Collins Dep.], p. 242-43.)  Sheryl Collins admitted she included false information in her OPR report about Plaintiff.  (Ex. 20 [Collins Dep.], p. 239-240, 243-44, 246.)

145.     Henry Hemphill (African-American) worked as an OPR investigator.  (Ex. 21 [Hemphill Dep.], p. 4, 21.)   In 2013, Edward Dyner promoted Henry Hemphill.  (Ex. 21 [Hemphill Dep.], p. 21-22.)  Henry Hemphill testified that he has signed nominating petitions for Democratic political candidates, including Sherriff Dart.  (Ex. 21 [Hemphill Dep.], p. 72-75, 232-33.)  Henry Hemphill admitted that he understood he was named individually as a defendant in the case, that it was unlawful to take employment actions against Plaintiff based on politics or race.  (Ex. 21 [Hemphill Dep.], p. 226-227.)  Henry Hemphill took Rosemarie Nolan's word for it that Plaintiff did not have secondary employment forms on file and did not check himself. (Ex. 21 [Hemphill Dep.], p. 227.)