**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT BLESS**, | ) | No. 13 C 4271 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. John Z. Lee |
| v. | ) | |
| | ) | |
| **COOK COUNTY SHERIFF'S OFFICE**, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56 STATEMENT**

Plaintiff Robert Bless, pursuant to Local Rule 56.1, respectfully submits his response to

Defendants' Rule 56 statement of facts.

**PARTIES**[1]

1. Plaintiff, Robert Bless, is a Caucasian male resident of the Northern District of Illinois and was employed by the Cook County Sheriff's Office from 1996 until 2013. (Exhibit 1, Third Amended Complaint, ¶ 5; Exhibit 2, Plaintiff's Deposition, p. 40:11-12)

**RESPONSE: Undisputed.**

2. Defendants are the Cook County Sheriff's Office ("Sheriff's Office"), Cook County Sheriff Thomas J. Dart, Zelda Whittler, Joseph Ways, Edward Dyner, Dewayne Holbrook, Rosemarie Nolan, Sheryl Collins, Henry Hemphill, and the Cook County Sheriff's Merit Board. (Ex. 1, ¶¶ 7-27)

**RESPONSE: Undisputed.**

---

[1]. Citations to Plaintiff's Response to Defendants' Rule 56.1 Statement (¶¶ 1-80) and Plaintiff's Rule 56.1 Statement (¶¶ 81-145) are cited only by paragraph number, *e.g.*, " *see* ¶ _." Plaintiff's response cites to portions of the evidentiary record that are contained in Plaintiff's Appendix of Exhibits filed in conjunction with Plaintiff's Rule 56 statement and as part of Plaintiff's response to Defendants' motion for summary judgment. Plaintiff's Appendix of Exhibits are cited as "Pl. Ex." followed by and exhibit number and description of the material being cited. The Merit Board filed the Administrative Record and stamped each page with "Ad. Rev." followed by a specific page number. (R. 26-29.) Plaintiff cites to the Administrative Record as "AR" followed by the Merit Board's numbering system, e.g., "AR__."

3.    Cook County Sheriff Thomas J. Dart ("Sheriff Dart") is a Caucasian male and is a Democrat. The Cook County Sheriff's Office has approximately 6,500 current employees and thousands of former employees. (Exhibit 9, Deposition of Rosemarie Nolan, December 9, 2016 ("Day 1"), p. 24:18-23; Exhibit 12, Sheriff Dart's Answers to Interrogatories, ¶ 21).

**RESPONSE: Undisputed.**

4.    At all times herein relevant, Zelda Whittler ("Undersheriff Whittler"), an African-American female, served as the Undersheriff of the Sheriff's Office. (Ex. 1, ¶ 15; Exhibit 3, Deposition of Zelda Whittler, p. 9:15-17, 10:9-11; Ex. 12, ¶ 2, 6)

**RESPONSE: Undisputed.**

5.    At all times herein relevant, Joseph Ways ("Executive Director Ways"), a Caucasian male and a Republican, served as the Executive Director of the Sheriff's Office's Office of Professional Review ("OPR"). (Ex. 1, ¶ 13; Exhibit 4, Deposition of Joseph Ways, February 2, 2017 ("Day 2"), pp. 4:19-5:1, 307:8-13; Ex. 12, ¶ 2,7) OPR has the responsibility within the Sheriff's Office to investigate potential wrongdoing of Sheriff's Office employees. (Ex. 4, December 1, 2016 ("Day 1"), pp. 16:11-19, 24:14-24; Exhibit 6, Deposition of DeWayne Holbrook, pp. 278:6-279:24).

**RESPONSE: Disputed in part.**

**Plaintiff disputes and objects to the statement that Joseph Ways is a "Republican" because it is immaterial, misleading and mischaracterizes the facts.**

**The statement is immaterial for summary judgment purposes. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 908 (7th Cir. 2018).**

**The statement is misleading and mischaracterizes the facts because Joseph Ways testified only that he "identified" as a Republican privately, but stated he never engaged in political activity for political candidates.  (Pl. Ex. 2 [Ways Dep.], p. 68-69, 333-334.)**

**Contrary to Defendants' assertion, Joseph Ways admitted to signing a nominating petition for a Democratic candidate for political office.  (Ex. 2 [Ways Dep.], p. 335.)**

**The remaining statements are undisputed.**

6.  At all times herein relevant, Edward Dyner ("Director Dyner"), a Caucasian male and a Republican, served as a Director at OPR. (Ex. 1, ¶ 17; Exhibit 5, Deposition of Edward Dyner, December 7, 2016 ("Day 1"), p. 5:8-9, March 8, 2017 ("Day 2"), p. 74:19-24; Ex. 12, ¶ 2,8)

**RESPONSE: Disputed in part.**

**Plaintiff disputes and objects to the statement that Edward Dyner is a "Republican" because it is immaterial, misleading and mischaracterizes the facts.**

**The statement is immaterial for summary judgment purposes.** *Johnson v. Advocate Health & Hosps. Corp.*, **892 F.3d 887, 908 (7th Cir. 2018).**

**The statement is misleading and mischaracterizes the facts because Edward Dyner testified only that he privately "identified as a Republican" but, apart from signing one petition for a candidate for political office that he could not remember, he did not engage in any political activity, *e.g.*, he did not make financial contributions for political reasons, he did not attend rallies or fundraisers, and he did not post signs. (Ex. 23 [Dyner I], p. 55.)**

**The remaining statements are undisputed.**

7.  At all times herein relevant, Dewayne Holbrook ("Chief Holbrook"), an African-American male, served as the Chief of Police for the Sheriff's Office's Police Department. (Ex. 1, ¶ 11; Ex. 6, pp. 5:23-24, 18:24-19:7; Ex. 12, ¶ 10)

**RESPONSE: Undisputed.**

8.  At all times herein relevant, Sheryl Collins ("Investigator Collins"), an African-American female, served as an investigator for OPR. (Ex. 1, ¶ 19; Exhibit 7, Deposition of Sheryl Collins, pp. 6:11-13, 18:16-23, 19:8-11)

**RESPONSE: Undisputed.**

9.  At all times herein relevant, Henry Hemphill ("Investigator Hemphill"), an African-American male, served as an investigator for OPR. (Ex. 1, ¶ 20; Exhibit 8, Deposition of Henry Hemphill, pp. 4:20-22, 21:15-22)

**RESPONSE: Undisputed.**

10.    At all times herein relevant, Rosemarie Nolan ("Personnel Director Nolan"), a Caucasian female, served as Personnel Director for the Sheriff's Office. (Ex. 1, ¶ 21; Exhibit 9, Deposition of Rosemarie Nolan, Day 1, p. 4:10-12, 5:14-19; Ex. 12, ¶ 2, 9)

**RESPONSE: Undisputed.**

11.    The Cook County Sheriff's Merit Board (the "Merit Board") is a statutorily authorized administrative body charged with conducting hearings on disciplinary matters involving Sheriff's Office police officers when the Sheriff's Office files written charges requesting suspension in excess of thirty (30) days or separation from service. (Ex. 1, ¶ 24; Exhibit 10, 55 ILCS 5/3-7012, 55 ILCS 5/3-7002) The Merit Board has the exclusive authority to make findings of guilt and to order the separation of Sheriff's Office police officers. (Ex. 10) Upon an order from the Merit Board that an employee should be separated from the Sheriff's Office, Sheriff Dart is statutorily required to direct that the employee be separated from the Sheriff's Office, as ordered by the Board. (Ex. 10; Ex. 12, ¶ 2, 17) By statute, "[n]o more than 3 members of the Board shall be affiliated with the same political party, except that as additional members are appointed by the Sheriff . . . the political affiliation of the Board shall be such that no more than one-half of the members plus one additional member may be affiliated with the same political party." (Ex. 10), Additionally, "[n]o member shall have held or have been a candidate for an elective public office within one year preceding his or her appointment." (Ex. 10) Since January of 2013, not including cases currently pending before the Merit Board and aside from cases resolved by either the employee's resignation, a last chance agreement, a settlement agreement, or where an employee had multiple cases and was terminated as a result of one of the other cases, approximately 30% of the time, the Merit Board has either imposed less discipline than the Sheriff's Office was seeking or determined that the employee should not be disciplined at all. (Exhibit 20, Affidavit of Miriam S. Santiago)

**RESPONSE: Objection.**

**The last sentence of this paragraph should be stricken and disregarded for the reasons stated in Plaintiff's motion to strike (R. 295 & 301) which the Court stated it would consider "in conjunction with the motion for summary judgment." (R. 312).**

**Plaintiff objects because Local Rule 56.1(a) permits only "short numbered paragraphs" and the statements in this paragraph violate the rule.**

**Subject to objections, disputed in part.**

**Plaintiff does not dispute that the Merit Board was created per state statute.**

**Plaintiff disputes the contention that the Merit Board is, in fact, an entity that is separate from the CCSO.**

Although created by statute (55 ILCS 5/3-7002), the evidence, viewed in the requisite light most favorable to Plaintiff, shows that the Merit Board is plainly under Sheriff Dart's control. For example, Merit Board members are appointed by Sheriff Dart and the CCSO has stated previously that the Merit Board is an "agency" of the CCSO; the CCSO "delegates functions" to the Merit Board; and the Merit Board "represents the [CCSO's] legal interests. *Hernandez v CCSO et al.*, Case: 07 C 855, Dkt. No. 485 at 8-9; *Bless v. CCSO*, No. 13 C 4271, 2016 WL 958554, at *5 (N.D. Ill. Mar. 8, 2016); *Roman v. Cook Cnty. Sheriff's Merit Bd.*, 2014 IL App (1st) 123308, ¶ 78.

Further, the Merit Board was was constituted illegally. (Dkt. No. 352, p. 8) *See also Taylor v. Dart*, 2016 IL App (1st) 143684 & *Taylor v. Dart*, 2017 IL App (1st) 143684-B.

The Merit Board was illegally constituted because John Rosales, a political supporter of Sheriff Dart, served on the board in violation of state law. *See also* ¶ 143.

### JURISDICTION AND VENUE

12. Plaintiff's Third Amended Complaint invokes jurisdiction over Counts I, III and V pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343 and over Count IV pursuant to this Court's supplemental jurisdiction as codified in 28 U.S.C. §1367(a). (Ex. 1, ¶ 2)

**RESPONSE: Undisputed.**

13. Venue is proper in this Court because all of the events at issue occurred in this judicial district. (Ex. 1, ¶ 3)

**RESPONSE: Undisputed.**

### PLAINTIFF'S EMPLOYMENT AND SECONDARY EMPLOYMENT

14. Plaintiff began working at the Sheriff's Office as a courtroom deputy in 1996. (Ex. 1, ¶ 28; Ex. 2, pp. 40:11-41:6)

**RESPONSE: Undisputed.**

15. In 1997, Plaintiff became a police officer with the Cook County Sheriff's Police Department. (Ex. 2, p. 41:7-9) Specifically, Plaintiff worked as a patrol officer. (Ex. 1, ¶ 29; Ex. 2, p. 35:13-36:6)

**RESPONSE: Undisputed.**

16. As a patrol officer, Plaintiff's general duties and responsibilities included driving a marked squad car, effectuating traffic stops, issuing citations, and answering calls. (Ex. 2, p. 36:10-22)

**RESPONSE: Undisputed.**

17. In addition to being a police officer, Plaintiff also became a licensed attorney in 2004. (Ex. 1, ¶ 31; Ex. 2, p. 44:9-17)

**RESPONSE: Undisputed.**

18. At that time, while employed by the Sheriff's Office, Plaintiff began working secondary employment as an attorney. (Ex. 2, p. 44:9-17) Plaintiff was self-employed as an attorney, establishing the law firm of Bless & Associates, Inc. (Ex. 2, pp. 44:14-45:4) Plaintiff estimates that he worked approximately ten (10) hours per week as an attorney during his career as a lawyer. (Ex. 2, p. 47:4-7)

**RESPONSE: Undisputed.**

19. Beginning in 2008, also while employed by the Sheriff's Office and practicing as an attorney, Plaintiff engaged in additional secondary employment as a McHenry County Commissioner. (Ex. 1, ¶ 32; Ex. 2, p. 49:22-50:3) Plaintiff was elected to the position of McHenry County Commissioner and ran a political campaign as a Republican. (Ex. 2, pp. 50:4-9, 70:4-7) As a McHenry County Commissioner, Plaintiff was paid approximately twenty thousand dollars ($20,000.00) per year. (Ex. 2, p. 89:3-7)

**RESPONSE: Undisputed.**

20. Plaintiff never advised or otherwise conveyed to any of the Defendants that he was running for McHenry County Commissioner, never told any of them about the fundraisers he held, and never discussed his electoral victory with them. (Ex. 2, pp. 81:13-20, 82:3-22; Ex. 12, ¶ 1)

**RESPONSE: Disputed in part.**

**Excluding Sheriff Dart (*see* ¶ 65 ), Plaintiff does not dispute that he testified that he did not tell the individual defendants directly that he was running for political office, his fundraisers or his victory at the time those events occurred.**

6

Plaintiff disputes the implication that Defendants were purportedly unaware of Plaintiff's protected activity because it mischaracterizes the evidence.

The evidence, viewed in Plaintiff's favor, is that Defendants were aware of his protected activities.

For example, Plaintiff testified that defendant Dewayne Holbrook (Chief of Police) was aware of his political activity because people in Maywood talked openly about Plaintiff running for office. (Ex. 25 [Bless], p. 83.)

Further, Plaintiff had public campaign events, like fundraisers, that were attended by several CCSO employees, including supervisor level employees (and one who was described as the "boss" of Maywood"), and that there was "a lot of press" covering his campaign and election. (Ex. 25 [Bless], p. 49-65, 82; Ex. 3 [Bless Campaign materials].)

Plaintiff's political activity was also otherwise generally known and publicly available information as proven by, among other things, the fact that CCSO employees attended Plaintiff's campaign events and it was covered by the press. (*see* ¶ 85.)

Plaintiff also disputes the implication that Defendants were purportedly "unaware" of his political activity because, among other reasons, Plaintiff provided it directly to them (*see* ¶ 100, 104) and each of the individual defendants (excluding Sheriff Dart) admitted to reviewing and signing off on Plaintiff's OPR file which contained detailed information about his political activity. (Ex. 19 [Bless OPR File], p. 8-9, 181-82.)

21. Plaintiff never advised or otherwise conveyed to any of the Defendants that he was a Republican. (Ex. 2, pp. 122:5-16, 125:5-22, 128:24-129:13; 131:8-14, 133:11-18, 134:5- 15; Ex. 3, pp. 118:23-119:3; Ex. 4, Day 2, pp. 304:3-7, 306:17-20; Ex. 5, Day 2 p. 74:9-12; Ex. 6, p. 258:20-23; Ex. 8 p. 175:19-176:3, 216:17-22; Ex. 9, March 30, 2017 ("Day 2") p. 272:20- 23; Ex. 12, ¶ 1) Plaintiff admits that he has no firsthand knowledge that any of the individual Defendants, other than Sheriff Dart, according to Plaintiff, knew that he ran for political office and was elected a McHenry County Commissioner as a Republican "unless they read the newspaper." (Ex. 2, pp. 83:5-84:15)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that he testified that he did not tell any of the individual defendants directly, other than Sheriff Dart (*see* ¶ 65 ), that he was a Republican or about his campaign or election to public office.**

**Plaintiff disputes the implication that Defendants were, in fact, unaware of his political activity because it mischaracterizes the evidence. *See* ¶ 20, *supra*.**

**Further the suggestion that Defendants did not understand that Plaintiff's election to the McHenry County Board meant that he was a Republican (and not a Democrat) is not credible to anyone familiar with the area and especially for individual defendants like Joseph Ways and Edward Dyner who live in that area and claimed to privately "identify" as Republicans (despite agreeing to work for a Democratic administration).**

22. Prior to filing this lawsuit, Plaintiff never met Undersheriff Whittler, Executive Director Ways, or Director Dyner. (Ex. 2, pp. 122:5-16, 125:5-22, 134:5-15) Plaintiff's only interaction with Investigator Collins was through his OPR interview and Plaintiff only "probably" met Investigator Hemphill once before his OPR interview either on patrol or at the police academy. (Ex. 2, pp. 128:24-129:13, 130:15-131:14) Plaintiff's allegation that the individual Defendants discriminated against him and others on the basis of politics is because "[t]hat's what happened over the years at the Sheriff's office. It's always worked that way." (Ex. 2, p. 142:8-19)

**RESPONSE: Objection to the extent the statements in the last sentence mischaracterize Plaintiff's claim and the scope of his allegation that he was subjected to retaliation for his protected activity and the evidence supporting the claim.**

**Subject to objections, undisputed.**

## PLAINTIFF'S INJURY AND DISABILITY LEAVE

23. In September 2008, Plaintiff was injured in a motor vehicle accident, a head-on collision, while on duty as a patrol officer. (Ex. 1, ¶ 35; Ex. 2, p. 89:16; Exhibit 11, Administrative Review Record, p. 00512:9-00513:33)

**RESPONSE: Undisputed.**

24. As a result of the accident, Plaintiff suffered injuries to his neck and right shoulder. (Ex. 2, pp. 89:17-23; Ex 11, p. 00513:4-7) Specifically, Plaintiff had two fractures to the spinal segment in his neck and injured his shoulder to such an extent that he needed a prosthesis cap on the humeral head of his right shoulder. (Ex 2, p. 89:17-23; Ex 11, p. 00513:4-7, 00520:1-7)

**RESPONSE: Undisputed.**

25. On September 10, 2008, as a result of the above injuries, Plaintiff was unable to work as a patrol officer and went out on disability leave. (Ex 11, p. 00513:4-11, 00515:5- 00516:1, 00557:2-17)

**RESPONSE: Undisputed.**

26. While out on disability leave unable to work as a patrol office, Plaintiff collected temporary total disability payments for more than two (2) years. (Ex 11, p. 00513:4-00514:8; Ex. 14, ARDC Records, In re Robert Bless, Commission No. 2013PR00122, pp. 1-2, 11-15, 17-21.)

**RESPONSE: Undisputed.**

27. Plaintiff's treating neurosurgeon, Dr. Foroohar, indicated to Plaintiff that he should not drive in October and November 2008. (Ex 11, p. 00515:5-21, 00517:19-00518:2)

**RESPONSE: Objection, relevance. There is no evidence that Plaintiff was driving until February 2009 after he had recovered from his accident and obtained the sufficient ability to drive. (¶ 120.) Because there is no evidence that Plaintiff was driving in October 2008 or November 2008, these statements are irrelevant.**

**Subject to objections, undisputed.**

28. Plaintiff needed to be able to drive to work as a police officer. (Ex 11, p. 518:17-24) .

**RESPONSE: Disputed.  Plaintiff was not required to drive in order to work in a light duty capacity such as administrative assignments.  *See* ¶¶ 95, 101-02.**

29. In December 2008, Dr. Foroohar again advised Plaintiff to avoid driving, among other restrictions. (Ex 11, p. 00523:18-524:12, 00523:9-23)

**RESPONSE: Objection, relevance.  *See* ¶ 27.**

**Subject to objections, undisputed.**

30. Plaintiff was also examined by another neurosurgeon who performed an independent assessment of Plaintiff for the Cook County Department of Risk Management, the County Department, which is not part of the Sheriff's Office, responsible for managing Plaintiff's disability payments while Plaintiff was on medical leave. (Ex 11, p. 00532:7-17, 00535:21-24, 00537:17-23, 00605:8-15) This second neurosurgeon, Dr. Sean Salehi ("Dr. Salehi"), met with Plaintiff for the first time on November 11, 2008. (Ex 11, p. 00532:7-17, 00535:21-24, 00537:17-23, 00604:8-14, 00606:5-19) Plaintiff was not cleared to drive at that time. (Ex. 11, p. 00611:19-21)

**RESPONSE: Undisputed.**

31. Plaintiff also saw Dr. Salehi on January 30, 2009. (Ex 11, p. 00539:10-19, 00612:6-00613:1,00860-00863) Plaintiff reported to Dr. Salehi at that time that his neck pain felt worse since physical therapy. (Ex 11, p. 00540:21-00541:3). Dr. Salehi subsequently prepared a report to the Cook County Department of Risk Management as to his assessment of Plaintiff on January 30, 2009, indicating that Plaintiff should refrain from driving until Plaintiff's therapist felt his range of motion was adequate enough to drive. (Ex 11, p. 00542:19-24, 00615:24-00616:5) Dr. Salehi indicated in his report that Plaintiff should not be driving at that time because he felt Plaintiff would not be able to see blind spots while driving and was concerned that Plaintiff could not drive safely without an improvement to his range of motion. (Ex. 11, p. 00615:24-00616:16)

**RESPONSE: Undisputed.**

32. Plaintiff later reported to Dr. Salehi that he began driving at the end of February when some of his range of motion had returned in his neck. (Ex 11, p. 00618:12-16)

**RESPONSE: Undisputed.**

33. Plaintiff also saw a physical therapist for his injuries beginning in September 2008 and continuing until August 2010. (Ex 11, p. 00308:9-15, 00310:4-00311:14) From January 2009 through March of 2009, Plaintiff continued to experience neck pain and reported to his therapist on several occasions that there was no change as far as the condition of his neck. (Ex 11, p. 00544:23-00550:12) Plaintiff also reported to his therapist on May 11, 2009, that driving can cause him increased pain. (Ex 11, p. 00556:11-16)

**RESPONSE: Undisputed.**

34. Plaintiff's physical therapist did not tell Plaintiff he could drive because such a decision would have been within the purview of Plaintiff's physician. (Ex 11, p. 00360:12-19, 00363:8-20)

**RESPONSE: Objection, mischaracterizes the evidence.**

**Risk Management's doctor, Dr. Salehi, was the one who stated that Plaintiff's therapist should let Plaintiff know that he had sufficient ability to drive. Specifically, the evidence about Plaintiff's alleged driving restrictions, and driving activity, is that:**

**(1)    in October 2008, Plaintiff's treating physician recommended, among other things, that he refrain from driving as he was still wearing a neck brace and his neck was fragile (AR 517-18, 523-24);**

**(2)    in mid-December 2008, Plaintiff was able to remove his neck collar and begin physical therapy to improve the range of motion in his neck (*id*. at 540);**

**(3)    in January 2009, Dr. Salehi, a non-treating physician who was hired by Risk Management for purposes of providing an independent medical examination for Plaintiff's workers' compensation case, recommended that Plaintiff should refrain from driving until Plaintiff's physical therapist felt his range of motion was adequate for driving (*id*. at 542);**

**(4)    Dr. Salehi, Risk Management's doctor, never told Plaintiff that he was restricted from driving (*id*. at 632);**

**(5)    in January 2009, the CCSO hired a private investigator to conduct surveillance to determine whether Plaintiff was driving (*id*., at 462-64, 468);**

(6)     the investigator first observed Plaintiff driving in February 2009 (*id*. at 468);

(7)     Plaintiff testified that he began driving in February 2009 (*id*. at 543);

(8)     at the time Plaintiff began driving, there were no medical restrictions that prohibited him from driving (*id*. at 587-88);

(9)     in May 2009, Plaintiff informed Dr. Salehi that he began driving in February 2009 when he regained some range of motion back in his neck (*id*. at 618, 625); and

(10)    in Dr. Salehi's opinion, there was nothing wrong with Plaintiff driving in February 2009 as his review of the video surveillance of Plaintiff driving in February 2009 showed that Plaintiff's range of motion had improved such that he was capable of driving. (*id*. at 620-22).

35. By March of 2009, while still receiving disability benefits and not cleared to drive by his physicians, Plaintiff had been driving to work as a McHenry County Commissioner and also working as an attorney but had not sought to return to work as a Sheriff's police officer. (Ex 11, p. 00559:17-00560:16; Ex. 2, pp. 86:21-89:7) Additionally, Plaintiff admits he had not received approval to work either secondary jobs at that time. (Ex 11, p. 00560:17-00561:4)

**RESPONSE: Objection.   The statements in this paragraph are misleading and mischaracterizes the evidence.  *See* ¶¶ 34 & 120.**

**Plaintiff did not need to be "cleared to drive" in March, 2009, because he had no driving restriction in March 2009.  *See* ¶¶ 34 & 120.**

**Plaintiff sought requested to return to work in a light duty capacity, but he was told there were no assignments to accommodate his activity restriction which defendant Rosemarie Nolan testified was common would not be unusual.  *See* ¶¶ 101-103.**

**The last sentence of this paragraph is also misleading and mischaracterizes the evidence.  The evidence is that Plaintiff submitted secondary employment forms but did not hear back from the CCSO on the applications he submitted. *See* ¶ 100.**

## RISK MANAGEMENT INVESTIGATION

36. On or about February 2009, Cook County Risk Management, not the Sheriff's Office, contracted with a private investigation firm, Advanced Research Group, to conduct surveillance of Plaintiff. (Ex. 11, p. 00458:13-00460:5, 00462:20-00463:11; Ex. 12, ¶ 2).

**RESPONSE: Undisputed.**

37. Advanced Research Group conducted surveillance of Plaintiff for several months beginning in February of 2009 for the purpose of documenting Plaintiff's activities (Ex 11, p. 00463:12-00465:1, 00466:18-00467:19, 00709-00755). The surveillance was conducted by an independent, licensed private detective. (Ex 11, p. 00480:5-10)

**RESPONSE: Undisputed.**

38. In particular, the surveillance conducted by Advanced Research Group at the behest of Cook County Risk Management, had the objective of determining whether Plaintiff was driving in violation of the stated medical restrictions preventing him from working as a Police Officer. (Ex 11, p. 00465:16-20). Advanced Research Group documented its observations of Plaintiff in a series of investigative reports. (Ex 11, p. 00465:12-15, 00466:18-00467:19; , 00709-00755) Advanced Research Group also recorded video of Plaintiff's physical activities. (Ex 11, p. 00466:3-10)

**RESPONSE: Objection, irrelevant.**

**The facts in this paragraph, including the findings of Risk Management's investigator, should be disregarded and stricken because they are irrelevant and not admissible under FRE 401 because, among other reasons, there is no evidence that at the time of these events Plaintiff had a driving restriction or that Plaintiff was physically able to return to work even if he was driving.** *See* **¶¶ 34, 94-95, 98, 101-03, 113, 119-120. There is no evidence Plaintiff's driving impacted his IOD status or his ability to return to work.** (*Id*.)

**There is no evidence that Plaintiff's driving or observed activity impacted his eligibility for the workers' compensation disability benefits he was entitled to receive under the circumstances.** (*Id*.)

The evidence shows Defendants knew Plaintiff was not physically able to return to work in a full duty capacity, even if he was driving, and regardless of his observed activity. (*Id*.)

There is no evidence to contradict that Plaintiff regained sufficient range of motion to resume driving after January 30, 2009. (¶¶ 34, 113, 120.)

The facts in this paragraph, including the findings of Risk Management's investigator, should be disregarded and stricken because they are not admissible under FRE 404(b) as improper character evidence.

Even if relevant, at trial, this evidence is subject to exclusion as unfairly prejudicial under FRE 403.

Subject to objections, undisputed.

39. On February 2, 2009, Plaintiff was observed by the Advanced Research Group investigator driving around his neighborhood. (Ex 11, p. 00709-00710)

RESPONSE: Objection. *See* ¶ 38.

Subject to objections, undisputed.

40. On February 7, 2009, Plaintiff was observed by the Advanced Research Group investigator driving once again. (Ex 11, p. 00469:22-00470:24, 00715-00716)

RESPONSE: Objection. *See* ¶ 38.

Subject to objections, undisputed.

41. On March 6, 2009, Plaintiff was observed by the Advanced Research Group investigator driving forty-five and one half (45.5) miles. (Ex 11, p. 00475:10-00476:20, 00723-00724)

RESPONSE: Objection. *See* ¶ 38.

Subject to objections, undisputed.

42. On May 11, 2009, Plaintiff was observed by the Advanced Research Group investigator driving to the McHenry County Administrative Building in Woodstock, Illinois from his residence in Fox River Grove, Illinois. (Ex 11, p. 00465:2-11, 00477:2-24, 00742-00744)

**RESPONSE: Objection.** *See* ¶ 38.

**Subject to objections, undisputed.**

43. On May 18, 2009, Plaintiff was observed by the Advanced Research Group investigator driving to both the McHenry County Government Center and the McHenry County Administrative Building in Woodstock, Illinois and then to another location, originating from his residence in Fox River Grove, Illinois, traveling approximately sixty-four (64) miles. (Ex. 11, p. 00465:2-11, 00478:15-00479:13, 00749-00751)

**RESPONSE: Objection.** *See* ¶ 38.

**Subject to objections, undisputed.**

## OPR INVESTIGATION

44. On April 9, 2009, Personal Director Nolan was notified by Lisa Walik ("Walik"), the Director of Risk Management of the Cook County Department of Risk Management that Plaintiff was on Injured on Duty ("IOD") status and working as a McHenry County Board member and lawyer. Walik also reported that Plaintiff had driving restriction documents on file with Risk Management but that Risk Management had Plaintiff under surveillance with information that he was driving. (Ex. 9, Day 1, pp. 136:23-137:17, Day 2, pp. 273:22-274:5; Ex. 11, 00792)

**RESPONSE: Disputed in part.**

**Plaintiff did not have "driving restrictions documents on file with Risk Management" that prevented him from driving in April 2009.** *See* **¶¶ 34, 38 & 120.**

45. After receiving this information from Walik of Cook County Risk Management, Personnel Director Nolan drafted a memorandum to Executive Director Ways relaying the above information, advising Executive Director Ways to take the necessary action he might deem appropriate. (Ex. 9, Day 1, pp. 136:23-137:17, Day 2, p. 273:22-274:5; Ex. 11, p. 00792)

**RESPONSE: Undisputed.**

46. On or about April 9, 2009, Bonnie S. Heraty, Claims Adjuster for the Cook County Department of Risk Management advised Chief Holbrook by letter that Plaintiff was out on duty injury since September 10, 2008, and was driving and working two (2) additional jobs even though his treating physician indicated he could not work or drive. (Exhibit 15, Holbrook Notification and Memorandum, p. 1; Ex. 6, pp. 270:17-272:21; Ex. 7, pp. 229:19-230:9)

**RESPONSE: Disputed in part.**

**Plaintiff's treating physician never indicated Plaintiff "could not work or drive."**

*See* **¶¶ 34, 38 & 120.**

47. On April 14, 2009, Chief Holbrook authored a memorandum to Executive Director Ways stating that his office was informed that Plaintiff, who was on duty injury status, did not have a secondary employment request on file. (Ex. 6, pp. 270:17-272:21; Ex. 15, p. 2) Chief Holbrook had an obligation to report the information he received from Cook County Risk Management to the OPR, which has the responsibility within the Sheriff's Office to investigate potential wrongdoing of Sheriff's Office employees. (Ex. 6, pp. 278:6-279:24).

**RESPONSE: Undisputed.**

48. An OPR case was initiated following the information provided by Risk Management. (Ex. 4, Day 1, pp. 192:8-16, 195:11-197:8)

**RESPONSE: Disputed in part.**

**The OPR investigation was initiated based on actions taken by defendant Rosemarie Nolan and defendant Dewayne Holbrook based on what they claim was information first provided to them by Risk Management.  *See* ¶ 60.**

49. Investigator Collins was the primary OPR Investigator assigned to Plaintiff's case after another OPR investigator initially handled the matter, and OPR Investigator Hemphill provided assistance. (Ex. 7, p. 128:9-129:9, 144:6-21; Ex. 8, p. 16:6-9, 164:22-165:16)

**RESPONSE: Undisputed.**

50. The OPR investigation determined that Plaintiff did not submit a request for approval to work secondary employment as a McHenry County Commissioner before he began working as a McHenry County Commissioner in 2008, and Plaintiff has admitted this fact. (Ex 11, p. 00498:24-00499:16, 00685-00688)

**RESPONSE: Undisputed.**

51. Plaintiff claims he submitted a request for approval to work secondary employment as a McHenry County Commissioner and as a lawyer in the winter of 2009, while he was off work on disability leave, by giving the requests to his supervisor at a Dunkin Donuts in Palatine, Illinois. (Ex 11, p. 00499:17-00500:1, 00506:21-00508:11) However, the record reflects that Plaintiff failed to offer this explanation to Investigators Collins and Hemphill when they interviewed him, and there is no record of Plaintiff having submitted such requests. (Ex. 11, pp. 00024-00028, 00508:12-16, 00511:6-00512:4, 00685-00688, 00699-00700; Ex. 7, p. 156:4-8, 177:24-178:8, 218:11-23, 220:22-221:4; Ex. 2, pp. 103:1-22, 206:11-207:16; Ex. 14, p. 8, 13-14) Plaintiff also admits he never received approval to work either secondary employment positions. (Ex 11, p. 00024-00028, 00500:2-00501:17; 00511:6-14, 00685-00688; Ex. 2, p. 106:3-12).

**RESPONSE: Disputed in part.**

**These facts mischaracterize the circumstances regarding Plaintiff's submissions of secondary request forms generally and, in particular, in January 2009.  *See* ¶¶ 82-83, 91, 100, 104.  There also is no evidence that defendants Collins or Hemphill asked Plaintiff about the submission of secondary employment forms to Sgt. King in January 2009.  (*Id*.)**

**Defendants admit they lost the secondary employment forms they were required to maintain, so Defendants should be barred from asserting facts based on inferences from the documents they lost.  *See* ¶¶91, 97-98.**

**The evidence is that Plaintiff followed the practices for submitting secondary employment forms and he was never notified that his secondary employment forms were denied or his that permission to work secondary employment would be denied.  (*Id*.)**

**There is no evidence that Defendants would have denied Plaintiff's secondary employment forms if they were submitted as Plaintiff claimed. (*Id*.)**

52. Plaintiff returned from disability leave to his job as a Sheriff's police officer in November 2010, more than two (2) years after his accident and only after County Risk initiated its investigation of him. (Ex. 2, p. 91:5-10)

**RESPONSE: Disputed in part.**

**The evidence is that Plaintiff returned to work in November 2010 after he was medically cleared to do so.  *See* ¶ 103-04.**

There is no evidence that Plaintiff returned to work only "after County Risk initiated an investigation of him" and the citation does not support the assertion.

The evidence is that Plaintiff first learned of the investigation of in May 2011 when OPR interviewed him, after he returned to work in a full duty capacity and after he submitted secondary employment forms that were approved. *See* ¶ 114.

53. It was not until November 23, 2010, after County Risk and OPR initiated their investigations of him that Plaintiff, for the first time, requested to work secondary employment to work as a McHenry County Commissioner. (Ex 11, pp. 00509:18-00511:14).

**RESPONSE: Disputed in part.**

Plaintiff returned to work in November 2010 after he was medically cleared to do so. *See* ¶¶ 103-04.

There is no evidence that Plaintiff returned to work only "after County Risk and OPR initiated their investigation of him" and the citation does not support the assertion.

Plaintiff first learned of the investigation in May 2011 when OPR interviewed him, after he returned to work in a full duty capacity and after he submitted secondary employment forms to work as a McHenry Board Commissioner that were approved. *See* ¶ 114.

54. Plaintiff knew that it was his responsibility to renew his request to work secondary employment every year, which involved filing a secondary employment request form. (Ex 11, p. 00502:3-10) Plaintiff also knew that a secondary employment form needed to be filled out and approved by supervisors for him to be able to work secondary employment. (Ex 11, pp. 00505:21-00506:12). A copy of such approval by supervisors would have been returned to Plaintiff upon such approval, which serves as notice to Plaintiff that he had approval to work the requested secondary employment. (Ex 11, p. 00506:6-16)

**RESPONSE: Disputed in part.**

Plaintiff does not dispute that this paragraph accurately summarizes Plaintiff's deposition testimony. However, the statements are misleading.

The evidence is that Plaintiff followed the established practice for submitting secondary employment forms and he was never notified that his secondary employment forms were denied or his that permission to work secondary employment would be denied. *See* ¶¶91, 97-98. There also is no evidence that Defendants would have denied Plaintiff's secondary employment forms if they were submitted as Plaintiff claimed. *Id*.

Plaintiff disputes that the secondary employment policy as stated in this paragraph was strictly followed or enforced. To the contrary, the evidence is that there was "lax" enforcement of the secondary employment policy. (*See* Ex. 52, p. 6 & 8 [union grievance decision]; (Ex. 2 [Ways Dep.], p. 145, 162-63.)

The evidence shows that, in 2010, Plaintiff did not receive his approved forms back from the CCSO until six months after he submitted them. (AR 510-511.)

55. Plaintiff had submitted a request to work secondary employment as an attorney for the calendar year 2008 and understood the approval process. (Ex 11, p. 00505:3-20 00702-00703)

RESPONSE: Undisputed.

56. In the course of OPR's investigation of Plaintiff, OPR investigators contacted both the Sheriff's Office's Personnel Department and the Police Department to determine whether Plaintiff had approved secondary employment requests on file to work as a McHenry County Commissioner and as an attorney during the period he was out of work on disability leave. (Ex. 7, p. 142:5-15, 175:13-176:2, 243:8-13; Ex. 8, pp. 190:15-23, 191:10-192:1) The Personnel Department received approved secondary employment requests during that time period and maintained copies of those requests. (Ex. 9, Day 1, p. 105:18-106:20, 108:17-109:11) The Personnel Department did not have record of any active secondary employment requests on file for Plaintiff covering the period of January 31, 2009, to December 9, 2010. (Ex 11, p. 00439:1-6) Additionally, during the course of OPR's investigation, Chief Holbrook's administrative assistant sent the secondary employment request forms the Sheriff's Police Department had on file for Plaintiff (Ex. 6, pp. 195:3-196:4). Those forms did not include requests for the year 2009 and only one for the year 2008. (Ex. 6, p. 197:11-15)

RESPONSE: Disputed in part.

**Plaintiff does not dispute that the paragraphs accurately summarizes the deposition testimony provided by these witnesses.**

**Plaintiff disputes the testimony is reliable or credible.**

**The evidence is that defendant Rosemarie Nolan and Dewayne Holbrook provided untrue information and withheld facts from OPR. *See* ¶¶ 91-93, 115, 117, 135-39.**

57. Following the completion of OPR's investigation, OPR's findings and recommended discipline with respect to Plaintiff were reviewed and affirmed in Command Channel Review by Executive Director Ways, Chief Holbrook, and Undersheriff Whittler in July 2011. (Ex. 11, 00682; Ex. 3, pp. 5:18-6:6; Ex. 4, Day 1, pp. 169:20-172:8; Ex. 6, pp. 98:3-6, 165:9-16)

**RESPONSE: Undisputed.**

58. One of Undersheriff Whittler's primary responsibilities at the Sheriff's Office is to perform the Command Channel Review of OPR cases. (Ex. 3, p. 19:15-23) Sheriff Dart did and does not direct Undersheriff Whittler's decision-making process related to Command Channel Review and had and has no personal involvement in the Command Channel Review process generally, including with respect to Plaintiff's OPR case. (Exhibit 13, Undersheriff Whittler's Answers and Objections to Plaintiff's Second Set of Interrogatories, ¶ 5; Ex. 12, ¶ 2)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that the paragraphs accurately summarizes the testimony provided by Defendant Whittler.**

**Plaintiff disputes the testimony is reliable or credible. *See* ¶¶127-34, 137.**

## RELEVANT GENERAL ORDERS

59. Cook County Sheriff's Office General Order 07-2, "Secondary Employment," was in effect at the time Plaintiff was on disability leave from the Sheriff's Office. (Ex. 11, pp. 00914-00922) General Order 07-2 provides that before an employee can accept or commence any secondary employment, he or she must receive permission through the chain of command from his or her Department Head. (Ex. 11, p. 00915) General Order 07-2 further provides that an employee's approved secondary employment should be suspended if an employee is on a medical leave of absence. (Ex. 11, pp. 00916-00917)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes certain provisions of the secondary employment policy.**

**Plaintiff disputes that the summary is accurate or complete.** *See* **¶¶ 86-93. The policy does not say that "an employee's approved secondary employment should be suspended if an employee is on a medical leave of absence." IOD is not a restriction in the policy. The policy states that the supervisor is required to <u>request</u> suspension (which Chief Holbrook did not do), which triggers the "<u>continual review</u>" to ensure secondary employment should continue to be approved. There is no rule prohibiting secondary employment while on IOD, provided that secondary employment does not violate medical activity restrictions.** *See* **¶¶87, 89.**

## PLAINTIFF'S TERMINATION

60. On October 6, 2011, the Sheriff's Office, by Undersheriff Whittler, filed a Complaint against Plaintiff at the Merit Board, alleging that (1) on or about September 10, 2008, as a result of a duty incident, Plaintiff went on the Medical Rolls-Injured On Duty; (2) Plaintiff's treating physician reported that Plaintiff could not work or drive; (3) Plaintiff had received temporary disability checks from the Cook County Insurance Benefit Fund; (4) that while on the Medical Rolls-IOD, Plaintiff had been employed as both a McHenry County Commissioner and as an attorney; (5) Plaintiff was not authorized to work secondary employment; and (6) Plaintiff falsely reported to OPR investigators that he had secondary employment requests on file including for the period he was out on leave. (Ex. 11, pp. 00018-00023)

**RESPONSE: Undisputed.**

61. Merit Board Commissioners Lance C. Tyson and James Nally heard evidence presented by Plaintiff, thought counsel, pursuant to a Merit Board trial that commenced on November 13, 2012, and concluded on January 29, 2013. (Ex. 11, p. 00024-00028; Ex. 2, p. 108:4-14). After evaluating the credibility of witnesses and supporting evidence, on May 3, 2013, the Merit Board issued its decision in Plaintiff's Merit Board case, finding that "(1) [Plaintiff] was not authorized to engage in secondary employment at any time while receiving temporary disability checks from the Cook County Insurance Benefit Fund; (2) [Plaintiff's] Department Head nor designee gave authorization to [Plaintiff] to engage in secondary employment in 2009 through and including November 23, 2010; [and] (3) [Plaintiff] falsely reported to investigators from the Office of Professional Review that he had a secondary employment request on file for his business, Bless and Associates, for each year including 2010. (Ex. 11, p. 00024-00028) The Board indicated the egregious nature of Plaintiff's conduct, noting

its conclusion that Plaintiff lied to continue to collect disability benefits while also working as a McHenry County Commissioner and attorney and driving against stated medical restrictions. (Ex. 11, p. 00027) Based on its findings, the Merit Board Ordered Plaintiff be terminated from employment with the Sheriff's Office effective October 6, 2011. (Ex. 11, p. 00027; Ex. 1, ¶ 44) Sheriff Dart did not communicate with Merit Board members about Merit Board hiring decisions, specific Merit Board hearings or specific Merit Board employment decisions, during the time period relative this present lawsuit and specifically as to Plaintiff or any employees accused of similar conduct as Plaintiff was found to have committed. (Ex. 12, ¶ 17).

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes aspects of the Merit Board proceedings.**

**Plaintiff disputes the summary as misleading and incomplete. *See also* R. 291.**

**Plaintiff disputes the last sentence is reliable or credible.**

### ARDC SUSPENDS PLAINTIFF'S LICENSE FOR SAME CONDUCT

62. On March 12, 2015, the Illinois Attorney Registration and Disciplinary Commission ("ARDC") suspended Plaintiff's license to practice law in the State of Illinois for three years and until further order of the Court. (Ex. 14, p. 16) This suspension of Plaintiff's law license was based on conduct including that while representing a widow with two young children in a wrongful death action, Plaintiff engaged in an intimate relationship with the client, entered into multiple improper business transactions with her involving obtaining a series of personal and business loans from her, and advised her to lie about their personal relationship at her deposition in the wrongful death action. (Ex. 14, p. 16; Ex. 2, p. 28:23-31:11). Plaintiff also made a false statement to the ARDC and testified falsely at his ARDC disciplinary hearing (Ex. 14, p. 16).

**RESPONSE: Objection.**

**The facts in this paragraph, including the findings of the ARDC and the suspension of Plaintiff's law license, should be disregarded and stricken as irrelevant and not admissible under FRE 401 because, among other reasons, the decision was issued after Plaintiff was terminated. Even if relevant, at trial, this evidence is subject to exclusion as unfairly prejudicial under FRE 403.**

The facts in this paragraph, including the findings of the ARDC and the suspension of Plaintiff's law license, should be disregarded and stricken because they are not admissible under FRE 404(b) as improper character evidence.

The facts in this paragraph, including the findings of the ARDC and the suspension of Plaintiff's law license, should be disregarded and stricken because they are not material in summary judgment, where the facts are required to be viewed in the light most favorable to the non-moving party, as improper credibility evidence. Fed. R. Civ. P. 56.

Subject to objections, disputed in part.

Plaintiff does not dispute that Plaintiff's law license was suspended.

Plaintiff disputes the summary of the ARDC proceedings as being misleading and incomplete.

63. On November 2016, the Illinois Supreme Court upheld the ARDC's suspension of Plaintiff's license to practice law in the State of Illinois for one (1) year, with the suspension to run consecutively to the three (3) year and until further order of the Court suspension imposed on Plaintiff on March 12, 2015, described above. (Ex. 14, p. 21). The suspension of Plaintiff's law license for one (1) additional year was based on the same conduct for which Plaintiff was terminated by the Merit Board. (Ex. 14, pp. 1-2, 11-15, 17-21; Ex. 11, pp. 00018-00028)

RESPONSE: Objection.

The facts in this paragraph, including the findings of the ARDC and the further suspension of Plaintiff's law license, should be disregarded and stricken because they are irrelevant and not admissible under FRE 401 because, among other reasons, the decision was issued after Plaintiff was terminated. Even if relevant, at trial, this evidence is subject to exclusion as unfairly prejudicial under FRE 403.

The facts in this paragraph, including the findings of the ARDC and the further suspension of Plaintiff's law license, should be disregarded and stricken because they are not admissible under FRE 404(b) as improper character evidence.

**The facts in this paragraph, including the findings of the ARDC and the further suspension of Plaintiff's law license, should be disregarded and stricken because they are not material in summary judgment proceedings, where the facts are required to be viewed in the light most favorable to Plaintiff, as improper credibility evidence. Fed. R. Civ. P. 56.**

**Subject to objections, disputed in part.**

**Plaintiff does not dispute that the ARDC further suspended Plaintiff's law license.**

**Plaintiff disputes the characterization of the ARDC proceedings as misleading and incomplete. *See also* Ex. 18 [July 2016 Review Board Report].**

### PLAINTIFF MEETS SHERIFF DART

64. According to Plaintiff, Jack Franks is an attorney out of McHenry County and an Illinois State Representative. (Ex. 2, 67:23-68:17) Plaintiff states that Franks "claims to be a Democrat" but openly supports the political campaigns of Republicans, including Plaintiff's political campaign for McHenry County Commissioner. (Ex. 2, p. 69:5-22) Plaintiff states that Franks is a mutual friend of Sheriff Dart and Plaintiff. (Ex. 2, pp. 67:23-68:2; 71:3-4, 73:2-12)

**RESPONSE: Undisputed.**

65. Plaintiff and Sheriff Dart spoke on one occasion, which Plaintiff claims was a political fundraiser for Franks in downtown of Chicago. (Ex. 2, pp. 66:24-67:22; Ex. 12, ¶ 1) Plaintiff states that his conversation with Dart started when Franks introduced him to Sheriff Dart and that he and Sheriff Dart spoke for several minutes alone. (Ex. 2, p. 72:17-73:1, 74:9-11; Ex. 12, ¶ 1) Plaintiff states that during the conversation, he and Sheriff Dart spoke about Plaintiff's September 2008 accident, Plaintiff's position on the McHenry County Board, and that Plaintiff was a Republican and an attorney. (Ex. 2, p. 73:13-17, 76:3-10) Plaintiff states that Sheriff Dart did not react when Plaintiff told Sheriff Dart that Plaintiff was a Republican, had been elected to the McHenry County Board, or worked as an attorney. (Ex. 2, p. 76:23-77:9, 77:23-10) Plaintiff and Sheriff Dart were just conversing at that point, and they went on to discuss other topics and make "small talk." (Ex. 2, pp. 74:17-75:5) Sheriff Dart recalls meeting Plaintiff one time at an office building with Jack Franks but does not recall the date, time or exact location. (Ex. 12, ¶ 1) Sheriff Dart recalls Plaintiff stating he worked for the Sheriff's Office and was injured but does not recall any other comments made by Plaintiff during that brief encounter. (Ex. 2, p. 74: 17-75:21, 77:13-22; Ex. 12, ¶ 1)

24

**RESPONSE: Undisputed, except to state that the meeting occurred while Plaintiff was off of work, on IOD, after he was elected, before he returned to work in November 2010, and before May 2011 when Rosemarie Nolan requested an investigation into Plaintiff. (Ex. 25 [Bless Dep.], p. 189-90).**

66. Plaintiff states that his conversation with Dart was not confrontational and ended when he and Sheriff Dart shook hands and said "nice to meet you." (Ex. 2, pp. 79:20-24, 80:1-6) Plaintiff states he and Sheriff Dart have not spoken since that conversation. (Ex. 2, pp. 80:4-81:1) Plaintiff states that during the conversation, Sheriff Dart told Plaintiff to let him know if there was anything he could do for him. (Ex. 2, p. 75:11-16; Ex. 12, ¶ 1)

**RESPONSE: Undisputed.**

## NO EVIDENCE OF DISCRIMINATION

67. As the Elected Sheriff of Cook County, Sheriff Dart is authorized to create, implement and enforce policies and practices of the Sheriff's Department. Sheriff Dart, however, has no personal involvement in the implementation and enforcement of such policies and practices. Sheriff Dart delegated that authority to high ranking staff, including Rosemarie Nolan (Director of Personnel/Human Resources), Joseph Ways (Executive Director of Office of Professional Review) and Zelda Whittler (Undersheriff). (Ex. 12, ¶ 2-11)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes the information provided in Sheriff Dart's interrogatory answers.**

**Plaintiff disputes that Sheriff Dart's interrogatory answers provide a basis for summary judgment.**

**For example, these statements contradict the Answer filed by defendants Sheriff Dart, Rosemarie Nolan (Director of Personnel/Human Resources), Joseph Ways (Executive Director of Office of Professional Review) and Zelda Whittler (Undersheriff) in which they denied they were policymakers or decision-makers or that final policy-making authority was delegated to them by Sheriff Dart. (*See* R. 148 & 181 ¶¶ 10, 14, 16, 22).**

The CCSO Defendants answered the complaint by stating that they "lacked information sufficient to form a belief" as to whether or not it was true that Sheriff Dart was a policy-maker for the CCSO. (*Id*. ¶ 10.)

There is also evidence that all personnel moves, including whether to permit light-duty assignments, are made by Sheriff Dart. (*See* ¶¶ 121-22.)

68. Executive Director Ways is the former senior-most Assistant Special Agent in Charge at the Federal Bureau of Investigation's Chicago Office, and is a life-long Republican. (Ex. 4, Day 1, pp. 12:2-13:15, Day 2, p. 307:8-13). Executive Director Ways has never lived in Cook County, has never been eligible to vote for Sheriff Dart for Cook County Sheriff, and has not otherwise supported Sheriff Dart politically. (Ex. 4, Day 2, p. 309:6-311:5). Prior to joining the Sheriff's Office as the Executive Director of OPR, Executive Director Ways had only met Sheriff Dart once, at an FBI-related luncheon. (Ex. 4, Day 1, p. 14:7-15)

RESPONSE: Disputed in part.

Plaintiff does not dispute that this paragraph accurately summarizes testimony given by Defendant Ways.

Plaintiff disputes that Defendant Joseph Ways' contentions about his political affiliation are accurate or credible. (*See* ¶¶ 124-32, 111, 117, 140.)

69. It was Executive Director's Ways decision to recommend the termination of Plaintiff's employment with the Sheriff's Office based on the findings of the OPR investigation. (Ex. 4, Day 2, pp. 123:18-125:3) However, only the Merit Board had the authority to terminate an individual from the Sheriff's Office. (Ex. 4, Day 2, pp. 316:22-317:13)

RESPONSE: Objection. The last sentence is a legal conclusion.

Subject to objections, disputed in part.

Plaintiff does not dispute that this paragraph accurately summarizes testimony given by Defendant Joseph Ways.

Plaintiff disputes that defendant Joseph Ways' testimony is credible or reliable. (*See* ¶¶ 124-32, 111, 117, 140.)

70. Director Dyner, the former Special Agent in Charge responsible for supervising internal affairs investigations for the Office of Inspector General of the Department of Justice in Chicago is also a life-long Republican. (Ex. 5, Day 1, p. 15:11-22, Day 2, p. 74:19-24) Director Dyner has lived in Will County for twenty-one (21) years and therefore has never been eligible to vote for Sheriff Dart for Cook County Sheriff, has never otherwise supported Sheriff Dart politically, and would not vote for Sheriff Dart even if he was eligible to do so. (Ex. 5, Day 2, p. 75-76) Prior to joining the Sheriff's Office, Director Dyner had never met Sheriff Dart. (Ex. 5, Day 1, p. 19:3-11) Director Dyner was asked by Executive Director Ways to join the OPR. (Ex. 5, Day 1, p. 19:3-6)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes the testimony given by defendant Edward Dyner.**

**Plaintiff disputes that defendant Edward Dyner's testimony is credible or reliable. (See ¶¶ 141-42).**

71. Director Dyner was the supervisor of Investigators Collins and Hemphill and signed off on the OPR investigation of Plaintiff. (Ex. 7, p. 23:15-18; Ex. 8, p. 11:23-24; Ex. 5, pp. 35:9-36:7, 210:10-12, 238:24-239:12)

**RESPONSE: Undisputed.**

72. No evidence exists reflecting that any the Defendants were aware, before being sued in this lawsuit, that Plaintiff was a Republican. (Ex. 3, pp. 118:23-119:3; Ex. 4, Day 2, pp. 304:3-7, 306:17-20; Ex. 5, Day 2, p. 9-12; Ex. 6, p. 258:20-23; Ex. 7, pp. 228:21-229:5; Ex. 8, pp. 175:19-176:3, 216:17-22; Ex. 9, Day 2, p. 272:20-23; Ex. 12, ¶ 1)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes the testimony given by the individual defendants.**

**Plaintiff disputes that the testimony is credible or reliable. See ¶ 20.**

73. Plaintiff's only basis for his claim that all of the Defendants intentionally subjected him to unequal and discriminatory treatment on the basis of race, is that "[t]hey made the decisions against me because of those reasons and there could be no other reason why they did." (Ex. 2, pp. 176:16-177:8) None of the Defendants took any action with respect to Plaintiff, or even discussed taken any action with respect to Plaintiff, on the basis of his race. (Ex. 3, pp. 117:8-24; Ex. 4, Day 2, pp. 305:24-306:16; Ex. 5, Day 2, pp. 73:17-74:8; Ex. 6, pp. 257:20-258:19; Ex. 7, p. 229:6-9; Ex. 8, p. 225:11-13; Ex. 9, pp. 272:17-273:10)

**RESPONSE: Objection to the extent the statements mischaracterize Plaintiff's claim.**

**Subject to objections, disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes testimony given by Plaintiff.**

**Plaintiff disputes that his personal knowledge is the only basis for his claim.**

74. Plaintiff alleges that Officers Marlin Parks and Derreck Carrey, who are non-white, were both given written warnings for engaging in unauthorized secondary employment activities and were later promoted. (Ex. 1, ¶ 85) Specifically, Plaintiff claims, based on "common knowledge," that Officers Parks and Carrey were working secondary employment at a school while on duty and only received written warnings. (Ex. 1¶ 85; Ex. 2, pp. 173:8-174:22) However, the evidence adduced in discovery does not support that either Officers Parks or Carrey worked secondary employment while also on duty, that they lied about their secondary employment to OPR, or that they were on disability leave at the time of the incident. (Exhibit 16, Excerpts from OPR File No. 2007-01-081, pp. 35-42) Additionally, Officer Parks was suspended for his conduct as the supervisor of an officer who had engaged in a more egregious violation of the secondary employment policy. (Ex. 16, pp. 35-42)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph summarizes certain events with Marlin Parks, Conley Dyer and Derreck Carrey.**

**Plaintiff disputes the summary as misleading and incomplete. Plaintiff also disputes that any differences between these circumstances and Plaintiff's circumstances are material and, in any case, they support Plaintiff's claims.**

**Sgt. Marlin Parks supervised Conley Dyer and both of them were working unauthorized secondary employment at a high school along with Dyer. *See* Df. Ex. 16, p. 41-44. Dyer worked secondary employment at the high-school while he was scheduled to be on-duty for the CCSO. *Id*. p. 42.**

28

**Marlon Parks—a supervisor working unauthorized secondary employment who was supervising another employer (Dyer) who was also working unauthorized secondary employment with him at the high school—was only suspended for 2 days, with options, for his conduct.** *Id*. **p. 44. Dyer was only suspended for 30 days for his conduct.** *Id*.

75. Plaintiff alleges that former Sheriff's Officer Antonio McDonald had political "clout" or otherwise supported Sheriff Dart politically or was politically aligned with him because Officer McDonald was found to have engaged in unauthorized secondary employment for a period of approximately nine years and, as a result of that conduct, was suspended for a period of 30 days and not terminated. (Ex. 1, ¶ 49-50) However, Officer McDonald did not work secondary employment while also on duty being paid by the County for his time working a second job. (Exhibit 17, Excerpts from OPR File No. 2010-0230, pp. 1-5) Additionally, no evidence has been adduced in discovery that Officer McDonald was politically aligned with Sheriff Dart, as the campaign contributor list subpoenaed by Plaintiff in this matter did not reflect Officer McDonald as a supporter of Sheriff Dart. (Exhibit 18, Friends of Dart List)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that this paragraph accurately summarizes portions of Antonio McDonald's OPR file or that Antonio McDonald's name does not appear on the list of Sheriff Dart's contributors.**

**Plaintiff disputes the summary as misleading and incomplete. Plaintiff also disputes that any differences between McDonald's case and Plaintiff's circumstances are material and, in any case, they support Plaintiff's claims.**

**For example, these are not just mere allegations, Antonio McDonald intentionally did not submit secondary employment forms and, unlike Plaintiff, his misconduct persisted for nine years causing him to miss court dates and jeopardizing prosecutions, conduct which was far more egregious than Plaintiff's alleged conduct. (Ex. 1 [Holbrook], p. 224-26; Ex. 21 [Hemphill Dep.], p. 141-150.)**

29

Antonio McDonald, unlike Plaintiff, had been disciplined in the past before these events for missing court appearances.  (Ex. 21 [Hemphill Dep.], p. 144.)

Antonio McDonald gave false statements to OPR that he had submitted secondary employment forms when he had not.  (Ex. 21 [Hemphill Dep.], p. 149.)

Antonio McDonald was not referred to the State's Attorney's Office for prosecution. (Ex. 21 [Hemphill Dep.], p. 151, 171.)

Defendant Edward Dyner claimed the discipline Antonio McDonald received was "consistent with past practices."  (¶ 128.)

Defendant Henry Hemphill could not explain how the 30 days suspension with options is consistent with past practices or the discipline Plaintiff received.  (Ex. 21 [Hemphill Dep.], p. 149-50, 197-198.)

Joseph Ways could not explain the reason why Antonio McDonald received only 30 days suspension with options, meaning he could use personal time to fulfill the suspension requirements.  (Ex. 2 [Ways Dep.], p. 297-298; (Ex. 1 [Holbrook Dep.], p. 224.)  Joseph Ways could not identify one instance that would confirm that the discipline given the Antonio McDonald was "consistent with past practices."  (*Id*.)  Joseph Ways could not identify the reason why Antonio McDonald was permitted to serve his discipline "with options."  (*Id*., p. 301.)

Joseph Ways was asked to explain the difference between Plaintiff's discipline case and the Antonio McDonald discipline case and gave the following testimony:

**Q.   So what's the difference between McDonald's case and Bless's case?**

**MR. GOLDEN:  Objection to the form of the question.**

**A.   I have my thought, but I just want to confirm it before I state it on the record.   I can't find what I'm looking for, but I don't know what the difference is between the two.**

**(Ex. 2 [Ways Dep.], p. 338-339.)**

76. Plaintiff alleges that Sheriff's Officers Roger Shelton, John Praden, Maureen Moore had political "clout" or otherwise supported Sheriff Dart politically or was politically aligned with him. (Ex. 1, ¶ 51) Plaintiff further alleges that Officers Shelton, Praden, and Moore engaged in serious misconduct but Defendants did not bring charges for termination against them. (Ex. 1, ¶ 52; Ex. 2, pp. 149:21-150:3) Plaintiff's basis for asserting that these individuals had political "clout" is "common knowledge" and unspecified conversations he claims he had with Officers Praden and Moore 10 to 12 years ago. (Ex. 2, pp. 151:9-153:1) The misconduct Plaintiff alleges had nothing to do with secondary employment or making false statements to OPR or collecting disability. (Ex. 2, pp. 153:2-155:20) The campaign contributor list subpoenaed by Plaintiff in this matter did not reflect Officers Praden, Shelton, or Moore as supporters of Sheriff Dart. (Ex. 18)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that these officers do not appear on Sheriff Dart's contributor list.**

**Plaintiff disputes that his knowledge of these circumstances is deficient.  General knowledge in the community is strong circumstantial evidence of knowledge.  These cases further show a pattern and practice of political retaliation.**

77. Plaintiff alleges that Scott Kurtovich was the former Sherriff's First Assistant Executive Director who was found liable by a federal jury in August of 2012 for violating the First Amendment rights of Sheriff's employees but was not disciplined as a result because of politics. (Ex. 1, ¶¶ 53-57) Plaintiff, though, bases his allegations entirely on reading legal documents and on discussions with his attorney. (Ex. 2, p. 156:15-157:15)

**RESPONSE: Disputed in part.**

**Plaintiff does not dispute that these statements summarize Plaintiff's deposition testimony.**

The evidence of the jury verdict and punitive damage award against Kurtovich is public knowledge and well-known information. *See Burruss v. Cook Cty. Sheriff's Office*, No. 08 C 6621, 2013 WL 3754006, at *1 (N.D. Ill. July 15, 2013).

Evidence of Kurtovich's promotions are based on CCSO's personnel records. (Ex. 31 [Kurtovich Employment History].) *See also* ¶ 133.

78. Elleo Greene, Marlon Jones, Luis Santoyo, Robert Maxwell, Percy Taylor, and Tamara Wuerffel are current and former Sheriff's employees who filed lawsuits against the Sheriff's Office claiming, inter alia, political discrimination and/or retaliation because they did not have political "clout" and/or because they were otherwise not aligned with Sheriff Dart politically. (Ex. 1, ¶¶ 58-68) These cases, though, do not involve secondary employment or making false statements to OPR or collecting disability and Plaintiff has no first-hand knowledge of the alleged facts to which he refers. (Ex. 2, pp. 113:4-12; 115:21-116:23, 159:15-24, 161:15-162:1, 163:7-164:11, 165:8-20)

RESPONSE: Objection to the last sentence.

Plaintiff disputes that his knowledge of these circumstances is deficient. General knowledge in the community is strong circumstantial evidence of knowledge. These cases further show a pattern and practice of political retaliation.

Subject to objection, disputed in part.

Plaintiff does not dispute that this paragraph summarizes pending actions filed by CCSO employees against the CCSO for political reasons.

Plaintiff disputes the summary as misleading and incomplete.

79. Plaintiff also alleges that a federal jury verdict in the case of Burruss, et al. v. Cook County Sheriff's Office, et al., Case No. 08 CV 6621 (N.D. Ill.) supports his claim that the Sheriff's Office has a widespread practice of political discrimination and/or retaliation. (Ex. 1, ¶ 69-72. Plaintiff's knowledge of the Burruss case is limited to his reading the newspaper and reading court documents. (Ex. 2, pp. 166:11-167:22)

RESPONSE: Objection to the last sentence.

Plaintiff disputes that his knowledge of these circumstances is deficient. General knowledge in the community is strong circumstantial evidence knowledge. These cases further show a pattern and practice of political retaliation.

The evidence of the jury verdict against the CCSO is public knowledge and well-known information. *See, e.g., Burruss v. Cook Cty. Sheriff's Office*, No. 08 C 6621, 2013 WL 3754006, at *1 (N.D. Ill. July 15, 2013).

80. In May 2011, following Command Channel Review by individuals including Undersheriff Whittler, Sheriff's Correctional Officer Aaron Patton was recommended for termination after it was determined that he had engaged in secondary employment while on injured on duty status and then lied about it to OPR. (Exhibit 19, Excerpts from OPR File No. 2009-0095, pp. 5-10) Patton is African-American. (Ex. 19, p. 5)

RESPONSE: Disputed in part.

Plaintiff does not dispute that this paragraph summarizes the OPR file relating to Aaron Patton.

Plaintiff disputes the summary as misleading and incomplete. Aaron Patton's case is materially different than Plaintiff's case and, in fact, supports Plaintiff's claims.

For example, unlike Plaintiff, Aaron Patton had years of approved secondary employment. (*See* ¶¶ 82-83, 100, 104.)

Unlike Plaintiff, Aaron Patton falsely denied working secondary employment and he defrauded the CCSO by claiming he suffered a work injury working for the CCSO when, in fact, the injury was suffered at his second job. (Ex. 21 [Hemphill Dep.], p. 115-18.)

Unlike Plaintiff, Aaron Patton was subject to a different secondary employment policy that specifically prohibited secondary employment while on IOD. *See* Df. Ex. 19, p. 10.

Unlike Plaintiff, Aaron Patton was on IOD working secondary employment doing physical work as a security guard meaning that he could be working for the CCSO in a full duty capacity. *See* **Df. Ex. 19, p. 12.**

Unlike Plaintiff, Aaron Patton had six prior suspensions in 2009 and 2010—Plaintiff had no discipline history. *See* **Df. Ex. 19, p. 11.**

Unlike Plaintiff and despite his many offenses, Aaron Patton was not referred to the State's Attorney's Office for criminal charges. **(Ex. 21 [Hemphill Dep.], p. 128, 171.)**

Respectfully submitted,

By: /s/ Jeffrey R. Kulwin

Jeffrey R. Kulwin
KULWIN, MASCIOPINTO & KULWIN, LLP
161 North Clark Street, Suite 2500
Chicago, Illinois 60601
312-641-0300

## CERTIFICATE OF SERVICE

I, Jeffrey R. Kulwin, an attorney, certify that I caused copies of the foregoing to be e-filed with the Clerk of Court and served on counsel of record by email on November 21, 2019.

/s/ Jeffrey R. Kulwin